534 So.2d 329 (1987)
Joseph Bryant HOOKS, alias
v.
STATE.
3 Div. 282.
Court of Criminal Appeals of Alabama.
March 10, 1987.
On Return to Remand July 28, 1987.
Rehearing Denied September 8, 1987.
*332 Thomas M. Goggans of Goggans, Mclnnish, Bryant & Chambless, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
TYSON, Judge.
Joseph Bryant Hooks was indicted for the capital offenses of intentional murder during the course of a robbery (in violation of § 13A-5-40(a)(2), Code of Alabama 1975) and the murder of two or more persons (in violation of § 13A-5-40(a)(10), Code of Alabama 1975 as amended.) The appellant entered pleas of not guilty and not guilty by reason of insanity. After hearing the evidence presented at the guilt phase of the trial, the jury found the appellant guilty of both capital offenses as charged in the indictment. Following the sentence phase of the trial, the jury recommended (by a seven-to-five vote) that the appellant receive a sentence of life imprisonment without parole. Upon the trial court's consideration of the aggravating and mitigating circumstances in this case, the court rejected the jury's recommendation and sentenced the appellant to death.
Prior to trial, a hearing was held on the appellant's motion to suppress. The following evidence was adduced at this hearing.
J.W. Barnes, a Montgomery Police Department officer, testified that he was involved in the investigation of the deaths of Donald and Hannelore Bergquist. Around 11:00 p.m. on Sunday, November 18, 1984, the police came to the appellant's name on a list of approximately twenty names of people who were to be interviewed in connection *333 with this case. The list included neighbors and employees of the Bergquists.
At this time, Sergeant R.T. Ward called the appellant at his home and asked him if he would come to police headquarters. Following this call, the appellant voluntarily came down to police headquarters, accompanied by his wife. When he arrived at the station around midnight, the appellant was not arrested or charged with any offense. At this time, he was not guarded or told that he was not free to leave.
Barnes informed the appellant that he was investigating the shootings of the Bergquists and asked the appellant if he knew and had worked for the victims or had any knowledge concerning the case. The appellant denied any knowledge of the shootings and told Barnes that he was working at a construction site in Prattville with someone named Paul at the time of the shootings.
The appellant was then asked for fingerprints and a photograph. He agreed and, while these processes were being undertaken, a call was received by the police which contradicted the appellant's alibi. The appellant was then informed of the problems with his alibi and was advised of his constitutional rights. After signing a waiver of those rights, the appellant made a statement admitting some knowledge of the Bergquists' shootings. His statement was then videotaped and tape recorded, free of threats, promises, hopes of rewards or other inducements. The appellant's rights were included on the videotape.
Barnes testified that, following the discovery and translation of two letters found on the dashboard of the Bergquists' car, the investigation "singled out" (R. 13) and "centered on" (R. 15) this appellant. These letters had been written by Mrs. Bergquist and they mentioned a problem the victims were having with an individual who had been hired to do work in the kitchen of their house. The Bergquists had paid this individual for work that had not been completed. Barnes stated that a work order indicating the appellant was doing work for the victims in their kitchen was found in the victims' house. Barnes further stated that the letters written by Mrs. Bergquist also mentioned a former manager of the book store, which the Bergquists owned, who owed money to the victims and who had been fired by them.
Barnes testified that, although the appellant was a potential suspect when he came to the station on the night in question, he was not the prime suspect. At this point, the police were talking to other people and that everyone they talked with was a potential suspect and the appellant was treated the same as every other suspect. Barnes stated that the investigation had previously centered on others who had been cleared.
Barnes could not remember any mention of bond during his interview with the appellant. If the appellant had asked about bond, Barnes said that he would have told the appellant that he had nothing to do with the setting of bonds and that there was no bond in capital cases.
R.T. Ward testified that he called the appellant at 11:00 on the night in question and told him that the police were talking with anyone who knew or worked for the victims and asked him to come down to headquarters to talk to the police. When the appellant questioned coming to headquarters because of the lateness of the hour, Ward told him that the police preferred to go ahead and talk to him. The appellant then agreed to come to headquarters.
Ward testified that, when the call was made to the appellant, Officer Barnes was in the appellant's neighborhood to make sure the appellant did not attempt to leave town. The appellant, accompanied by his wife, arrived at headquarters around 11:45 p.m. At this time, the appellant was considered more of a suspect than anyone else due to the discovery of the letters written by the victim. Ward testified that, although the appellant was a suspect, the investigation had not centered on him. There were other people to whom the police had talked who were still considered as suspects, and a few people remained on the list to be interviewed.
*334 R.C. Martin operated the video equipment during the taping of the appellant's statement which began at 1:50 a.m. on November 19, 1984. A tape recorder was also used, due to problems with the audio portion of the video equipment. Martin testified that the taping of the appellant's statement was stopped only once because the appellant asked to use the bathroom. The appellant's statement was then played.
Officer Barnes was recalled to the stand and testified that he filled out a consent to search form on November 28, 1984 for the residence of Joseph and Karen Hooks, which is located at 3373 Brookwood Drive in Montgomery, Alabama. The form was signed by Karen Hooks who gave Barnes a belt from the bedroom closet of the residence. The belt appeared to have blood on it and it was turned over to the Department of Forensic Sciences.
E.B. Spivey, an investigator with the Montgomery Police Department, went to Joseph and Karen Hooks' residence on November 19, 1984 with a consent to search form. The form was signed by Karen Hooks and authorized a search of the premises and the appellant's truck. Several paper towels with blood on them were found in a trash can beside the truck, which was parked in the front yard. Inside the truck, a prescription bottle with the label torn off was found. The bottle contained some tablets. These items were turned over to the Department of Forensic Sciences.
Karen Hooks, the appellant's ex-wife, testified that she was married to the appellant in November of 1984 and that she accompanied him to police headquarters on November 18, 1984. She stated she remembered Officer Barnes stating that he was going to talk to the district attorney about bond but she could not recall if this was mentioned that night at headquarters or the following Tuesday night.
David Hooks, the appellant's brother, went to visit the appellant at the jail on the Tuesday following his arrest. The appellant told him that there was a good chance he would be out on bond by Christmas. Barnes, in the presence of Hooks, the appellant and his wife, stated that, although he could not promise anything, he would talk to the district attorney.
The appellant testified that he received a call from the police on the night in question and that they had a composite they wanted him to look at. The appellant told Ward that his wife and son were already asleep. Ward replied that the police were trying to get things cleared up and insisted the appellant come to headquarters.
The appellant agreed. On the way to headquarters, the appellant noticed he was being followed in an unmarked police vehicle. When he arrived at headquarters, the appellant was shown a composite of a man and asked if he knew him. Barnes asked the appellant what kind of relationship he had with the victims and outlined the details of the shootings to the appellant.
Barnes questioned the appellant about an alibi and the appellant was fingerprinted and photographed. He was then informed his alibi had fallen through.
The appellant inquired as to what he would be charged with, and Barnes told him that he'd be charged with capital murder and attempted murder (at the time, Mrs. Bergquist had not died). Barnes stated to the appellant that he would talk to the district attorney concerning the possibility of making bond.
The appellant then made an oral statement and signed the rights form after his statement. The appellant testified that he made the statement because he was told he could make bond. He stated that he would not have made a statement without a promise of bond. After the appellant testified, the appellant's motions to suppress were denied.
The following evidence was then presented at trial. John Henry Roberts, an enforcement agent with the Alabama Alcoholic Beverage Control Board, stated that at approximately 12:00 noon on November 16, 1984, he was looking for minors consuming alcohol in a wooded area off Mclnnis Road near Woodley Road in Montgomery. As he approached some abandoned houses on a dirt road, he noticed a man lying on the *335 ground on the left side of the dirt road. Roberts got out of the car and realized the man was dead. He radioed the ABC Board's central office who alerted the police.
Roberts waited for a patrol car out on Mclnnis Road and led them to the scene. Upon his return to the scene, Roberts noticed some women's shoes lying in the dirt road. The police then located the body of a woman approximately twenty-five yards from the other body. The woman was alive and making sounds.
Officer James Wicker made a video tape recording of the crime scene and of a 1977 Chevrolet automobile which was found in the Family Mart parking lot on South Boulevard in Montgomery. He testified that blood was found on the rear seat of the car. A woman's purse and portions of a necklace were found on the rear floorboard and dashboard of the car. Two letters were found on the front dashboard of the car.
T.R. Shanks collected evidence in this case, recorded the items and turned them over to the Department of Forensic Sciences. The following is a list of the items collected by Shanks:
1) Portions of a pearl necklace found in the rear floorboard and the rear window area of the Chevrolet and received by him from Officer Stano;
2) a black and white sweater with bloodstains, which belonged to Mrs. Bergquist;
3) a beige jacket, with a projectile in the pocket, which was found on the rear floorboard of the Chevrolet and was received by Shanks from Stano;
4) a pair of bloodstained women's slacks which was received from Officer Spivey;
5) a brown billfold belonging to Mr. Bergquist received from Officer Foster;
6) a spent projectile which was found inside the left front seat of the Chevrolet;
7) a portion of a pearl necklace which was found in the dirt road near Mrs. Bergquist's body and which was received from Barnes;
8) two letters, which were not written in English, were found in the Chevrolet and received from Stano;
9) a .38 Smith and Wesson revolver, serial #7J4149 received from Foster;
10) a pair of women's black shoes found at the scene;
11) a bottle containing pink pills and an empty Sineaid jar found in the appellant's truck;
12) samples of the appellant's hair;
13) a vinyl tile from the Chevrolet which was received from Stano.
Meredith Isaac Moss, a medical examiner field agent for the Department of Forensic Sciences, transported Donald Bergquist's body to Tuscaloosa where Dr. Henry Santina performed the autopsy. Moss received a sample of Mr. Bergquist's blood from Santina which he turned over to Bill Landrum. Mr. Bergquist's clothing, shoes, glasses and a bullet removed from his head were received by Moss and given to Lonnie Harden.
Veeta Owens, a paramedic with Haynes Ambulance Service, testified that she was called to a wooded area off Mclnnis Road after a report of a shooting. At the scene, she found two bodies, a deceased male and a woman in serious condition. The woman had been shot in the neck, face and chest area. She was moving but unable to talk. The woman was transported to St. Margaret's Hospital.
Doris McKinney testified that Donald Bergquist was her brother. She received word that her brother and his wife had been killed.
Lada Lewis, an employee with the district attorney's office, testified that she was born in Puerto Rico and is fluent in Spanish and English. As part of her job, Lewis is a translator and has been used as an interpreter in court.
Ursuler Schreiber, Hannelore Bergquist's sister, testified with the help of Lewis. Schreiber identified a letter addressed to Lucy Rutzka, a friend of Mrs. Bergquist who lives in Mexico City. She also identified a letter addressed to Catherine *336 Schreiber, Ursuler Schreiber's daughter and Mrs. Bergquist's niece.
George Dunham, a pathology assistant with the Department of Forensic Sciences, testified that he picked up a sample of Mrs. Bergquist's blood at St. Margaret's Hospital and turned it over to Craig Bailey.
Dr. Henry Santina performed the autopsy on Mr. Bergquist's body. His examination revealed the victim sustained two entrance gunshot wounds and one exit wound. There was an entrance wound to the right side of the chest and an exit wound to the left side of the back. There was also an entrance wound to the right side of the victim's chin. This wound was surrounded by stippling, which indicated a close range shot. The bullet from this gunshot severed the spinal column and was the cause of the victim's death.
Dr. Thomas Gilchrist performed the autopsy on Mrs. Bergquist's body. His examination revealed the victim sustained several gunshot wounds. The cause of her death was a gunshot wound to the head.
Gilchrist testified on cross-examination that PCP or "angel dust" is a hallucinogen. He stated that there is a higher incidence of violence associated with the use of PCP than with the use of other hallucinogens.
Officer V.H. Hicks participated in the search for the victims' car. He found the car at 11:00 on the night of November 16, 1984 in the Family Mart parking lot. He testified that he found blood on the front and back seat of the car as well as on the floorboard.
Officer R.V. Stano went to the Family Mart parking lot on the night of November 16, 1984 and collected evidence from a 1977 Chevrolet Caprice, Alabama tag number 3A 96380. He also photographed and processed the car for fingerprints.
Paul Seery testified that he was employed by Home Improvers on November 16, 1984. At approximately 7:15 a.m., the appellant picked up Seery at Home Improvers. The two drove to a job site in Prattville and began working. Around 9:15, the appellant told Seery he had to go to court and he left. He did not return until 1:00 p.m. Upon his return, the appellant told Seery that his court case had not come up yet and that he had to go back. He left again and returned at 3:30 to pick up Seery and drop him off at the company office. Seery stated that the appellant appeared normal each time he saw him that day.
The next day, the appellant came by Seery's house and told Seery that he had lied about going to court the previous day. The appellant said he had family problems and had driven around all day drinking beer. He then told Seery that some people for whom he had been working had been killed and that he was a suspect. The appellant asked Seery to tell the police that he had been working with him all day on Friday. Seery agreed.
After hearing about the Bergquists' shootings, Seery became suspicious of the appellant. When contacted by the police, Seery told them the truth about Friday's events.
Seery testified that he and the appellant would often smoke marijuana on the way home from work. Seery stated that he had taken PCP in the past and had observed others who had used it. He had never known the appellant to use PCP. Seery said that a person would have to be a frequent and longtime user of PCP in order to conceal the effects of the drug when that person was under the influence.
Officer Richard Foster testified that he found a brown billfold containing business and credit cards belonging to Donald Bergquist in a dumpster located behind a building at 540 Clay Street on November 19, 1984 at 2:00 a.m. He stated that the address could have been that of Home Improvers. No money was found in the wallet.
Foster also found a .38 Smith and Wesson revolver, serial # 7J4149 in a bathroom cabinet at 2327 Carter Avenue, the residence of Linda Norris. The gun contained five spent .38 cartridge hulls.
John Albert Smith went to the victims' house during the course of the investigation. The house was in the process of being remodeled.
*337 Officer E.B. Spivey received Mrs. Bergquist's shoes, slacks and top at the emergency room at St. Margaret's Hospital. He also received some flakes of jewelry which were found embedded in Mrs. Bergquist's neck.
Craig Bailey, a criminalist with the Department of Forensic Sciences, testified that he inspected a sample of the appellant's hair and compared it to the hair found on the front seat of the victims' Chevrolet. The hair found in the car was consistent in characteristics with the hair of the appellant.
William Landrum, a serologist with the Department of Forensic Sciences, testified that he examined several items of evidence which were turned over to him. The belt, given to the police by the appellant's wife, had bloodstains on it. Mrs. Bergquist's shoes and slacks were bloodstained. These stains, as well as the stains on the paper towels found in the appellant's yard, were Group O. Both victims' blood type was Group O. Forty-five percent of the population of the U.S. also has Group O blood type.
Linda Norris testified that the appellant built some kitchen cabinets for her and, later, for some of her friends. The quality of the appellant's work declined after he completed the work for her. The appellant had a key to Norris's house.
Norris stated that she owned a gun and identified it as the .38 Smith and Wesson revolver. At approximately 2:00 one morning, Norris heard someone at her door. She removed her gun from the bedside table where it was usually kept and carried it with her to the door. When Norris learned the police were at the door, she placed the gun in a cabinet in the bathroom. After she talked to the police, she gave Officer Foster the gun.
Lonnie Ray Harden, a firearms and tool mark examiner with the Department of Forensic Sciences, examined several items of evidence. He testified that the bullet recovered from Mr. Bergquist's head, the bullet from the seat of the victims' car and the expended cartridge cases in the .38 revolver were all fired through the .38 revolver.
Officer J.W. Barnes testified that the appellant made a statement to him during the early morning hours of November 19, 1984. The statement was videotaped and tape-recorded. Barnes stated that no threats, promises, hopes of reward or other inducements were made to the appellant in order to obtain his statement. Before he made the statement, the appellant was advised of his rights and he signed a waiver of those rights. The appellant's statement is as follows:
`QUESTIONING BY INVESTIGATOR BARNES
`ANSWERS BY THE DEFENDANT AS FOLLOWS:
`(UNINTELLIGIBLE AT BEGINNING.)
`A. Lord help me.
`Q. I need to ask questions.
`A. Man, is somebody gonna be looking at me?
`Q. Only the police.
`A. Okay.
`Q. Need any help?
`A. Thank you.
`(UNINTELLIGIBLE BACKGROUND VOICES.)
`Q. Are we ready?
`This is an interview in regards to the murder investigation of Donald Bergquist and the attempted murder of Halore (sic) Bergquist that occurred at Mclnnis and Woodley Road area here in Montgomery on 11/16/84 between the times of 9:00 A.M. and 12:15 P.M. The location of this interview is Montgomery Police Department. Today's date is November the 19th, 1984, the time is 2:00 A.M. Sitting to my right is Joseph B. Hooks, white male, date of birth 11/29/51. He is the defendant in this case and also present during the interview will be Corporal J. Smith and myself, Investigator J.W. Barnes. The statement will be concerning the murder investigation as previously mentioned.
`At this time, Mr. Hooks, before we begin I will show you a rights form that I *338 read to you on the 19th of November '84, at 1:09 A.M. and ask you if you recognize this form?
`A. Yes, sir.
`Q. And did you sign this form on the line with what appears to be the signature of Joe Hooks?
`A. Yes, sir.
`Q. At this time I would like you to listen as I am gonna advise you of your rights once again. Before asking you any questions I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation the court will appoint one before we question you. If you want to answer questions now you can do so but stop answering at any time.
`Do you understand the rights I've read to you?
`A. Yes, sir.
`Q. I will now read the second paragraph and it states: I fully understand the foregoing statement and do willingly agree to answer questions. I understand and I know what I'm doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.
`Do you understand that, Mr. Hooks?
`A. Yes, sir.
`Q. At this time do you wish to talk to me concerning the murder of Mr. Bergquist and the attempted murder of his wife?
`A. Yes, sir. Do Ido I have to sit here and let those people look at me? Do I have to?
`Q. If you don't want anybody in that room
`(UNINTELLIGIBLE)
`A. I'd rather not. I'd just rather turn my back to it. I don't want nobody to see me.
`Q. We can't turn our back but we'll get everybody out of that room if that's what you want.
`A. Yes, sir, I do. I don't care anything talk to nobody but you.
`Q. You just want to talk to with me?
`A. Yep. I'd better go (UNTELLIGIBLE) your (UNINTELLIGIBLE).
`Q. You would? All right. Anybody in there tell them to get out, please.
`(BRIEF PAUSE)
`A. Oh God.
`Q. All right, Mr. Hooks, we've complied with your request. Are you ready to begin?
`A. Yeah.
`Q. If you would, if you could speak up just a little bit.
`A. Okay. All right.
`Q. The first question I'm gonna ask you, Mr. Hooks, is are you responsible for the murder of Donald Bergquist and the attempted murder of his wife Halore (sic) Bergquist?
`A. Yes, sir.
`Q. All right, sir. Sir, if you will at this time tell me what occurrences took place on Friday, November the 16th, 1984 between the hours of 9:00 a.m. and 12:30 p.m.
`A. At 9:10 I picked the phone up and I called Mr. Bergquist and requested that he meet me at my home to look at the formica samples. At that time he said that he would. Before that I guess it was 8:30. I went by Linda Norris's house. I used the key to make access to her home to obtain the gun. I then met Mr. Bergquist and them at my home. We looked at the samples. He said that that wasn't what he really wanted, that he wanted somethin' else. I told him then that I could probably get it local. We sat in my home there for five or ten minutes. I then asked Mr. Bergquist if he wanted to go on down to the warehouse with me and he said yeah. So we got in his car and we proceeded to leave my home. We went down Woodley Road and, um, we turned off a dirt road to the left. We went into a dump site. I then told him that he would have to take a left at the next dirt road, which he did. And, um, he took it and we got to the abandon *339 house and I told him that we'd have to get out and walk around back and he cut his car off and when he did that's when I pulled the trigger. I pulled it out of my pants and I stuck it to his
`Q. You stuck it where?
`A. I stuck it to his head and I pulled the trigger. I then turned and I shot his wife. At that time I guess I just went crI I guess I just went crazy. I don't know, you know. I justanyway, I started to run and I remembered that, um, what was it? I forgot something. I forgot something. I had forgotten somethin'. I don't know what. I turned and I went back to the car and I pulled Mr. Bergquist out of the front seat and laid him down and I pulled his wife from the right side of the car in the back seat. I went towards the house and I laid her down and I got in the car and I drove it up to the parking lot and I parked it. I got out and then I walked home and I pulled my clothes off and I put `em in the washing machine and I washed `em. I wiped the gun off and I returned the gun to the Norris' then I went to Prattville and I told Paul, a worker that was with me that I had to leave again because by then ya'll hadhad found the bodies and, um, and um, I didn't know what to do with the billfold so I went back to the office to pick my check up and I just put it in a McDonald's bag and I threw it in the trash can there at the office, and um, I rode around the rest of the evening, um, till 3:30 and that's when I went back to the job site and, um, picked Paul up to take him back to the office. And, um, I got to the office and, um, we talked for a few minutes and, um, then I left and, um, I went home.
`Q. Okay. The way I understand it, you said that you went to Linda Norris's house at approximately 8:30 Friday morning, is that correct?
`A. No, sir. No, no, it was, it was, um, what time was it? What time was it? What time was it? Um
`Q. Just let me ask you this, Mr. Hooks
`A. Um
`Q. Did you get the gun before you called Mr. Bergquist?
`A. No, sir. I went and got the gun after II called him. I left a note on the door that I would be back soon and, um, they were waiting for me there when I got there, um
`Q. Why did you go and get the gun?
`A. It was the only wayit was the only thing that I thought that would resolve the problem, the financial problem. It wasn't, um, it really wasn'tit really wasn't a premeditated thing. It was, um, a spur of the moment things. I had, um, it's, um, which I haven't told you this, I washad took some drugs earlier.
`Q. What type of drugs?
`A. Um, um, I guess it would be called speed, and, and had been, had smoked some pot and, um,
`Q. Would you have considered yourself under the influence of these drugs to the point that it would have effected your reasoning?
`A. I'mI'mI'm sure it was because I don't think under my real mindI don't think I could have done it. I really don't. I don'tI just really don't think I could have done it. I know I couldn't have done it. I would of thought more of my wife and my son than I was thinking of my own self.
`Q. All right. How much drugs had you taken if you can recall?
`A. I took four hits of speed and some and smoked about two joints. The speed is in theam I gonna be charged with that?
`Q. No, sir.
`A. It's in the right hand sideit's on the driver's side of the truck and it's in a, it's in a pill bottle and, um, the, um, the pot, that was all the pot that I had was that. That was it. I didn't have any more than that.
`Q. All right, sir. So when you returned to your home from Linda Norris's residence the Bergquists were waiting on you, is that correct?
`A. Yes, sir.
`Q. And at this time what happened?
*340 `A. They came in and Don said that he had been out to the building there and, um, took a look at the china cabinet that I had built and, um, I showed him the, um, samples of the formica and, um, we had knelt down there by the couch and we was goin over that and he said that that wasn't quite the color, that maybe they had made a mistake in choosing the bottle green and I told him that I felt like, um, maybe I could, could get what he needed locally. And, um, they, um, they had a tile sample, um, that they was trying to match up with the formica and we talked about that a few minutes, just chit-chat about the color and the matching and everything, and, um, he said that he had some store business that he needed to take to, care of later, and um, that's when I asked him if he, if he wanted to, if he wanted to go to the warehouse and, um, of course I didn't have a warehouse, I didn't, um,I told him my father owned the property. He don't own the property, um. I don't know who owns the property. I didn't know.
`Q. When you left your house with the Bergquists how did you leave? In what vehicle?
`A. We left in the the [sic] automobile.
`Q. What type was it?
`A. A Chevrolet is all I know. I don't know what kind it was. It's a Chevrolet.
`Q. And which direction did you travel?
`A. Down Woodley Road, away from town.
`Q. All right. How were you seated in the automobile?
`A. I was in the front seat.
`Q. Driving or passenger?
`A. Passenger.
`Q. Where was Mr. Bergquist?
`A. He was driving.
`Q. Mrs.?
`A. She was in the back.
`Q. Behind her husband or behind you?
`A. Behind me.
`Q. All right, sir. At this time how did Mr. Bergquist get to the location off of Woodley Road?
`A. He went to the four-way stop where it ends at, um, Virginia Loop Road. I believe it'syeah, Virginia Loop Road. He took a right, he took his first left which is a dirt road, then he took his next left which is thea dirt road off a that dirt road and, um, he took a left off of that road which led up to the houses there.
`Q. Okay. These houses that you've mentioned, what condition are they in? Does anyone live in them?
`A. As far as I know they don't. I, I justI justI didn't even no [sic] that were there. I really didn't. I didn't even know the houses were there.
I justI thought the road just, just went up there in the woods. I didn't know there was any houses, I just
`Q. All right. Did Mr. Bergquist drive to this area or did you direct him to this area?
`A. I guess it would be that I directed him to that area.
`Q. All right, sir. And once you had reached this location on the dirt road by the houses is this the place where you shot Mr. Bergquist?
`A. Yes, sir. Yes, sir. yes, sir. Yes, sir.
`Q. Can you tell me how many times you shot him?
`A. I shot him twice.
`Q. Where did you shoot him?
`A. I shot him in the head and in the chest.
`Q. And Mrs. Bergquist?
`A. Oh God, that's the one I hated.
`Q. What's that?
`A. That's the one I hated. I didn't even wantI didn't even want to shoot her. I really didn't. I didn't know any other way to get out of it though. I think I shot her twice. I think it was twice. I don't remember. I really don't. I really don't remember. I really don't.
`Q. I believe you.
`A. I don't remember.
*341 `Q. I believe you. I believe you. Do you want to take a, take a rest and get you some water?
`A. No, go on with it. Go on with it.
`Q. Okay. When you shot the Bergquists were they in or out of the vehicle?
`A. They was in the car.
`Q. How did they get out of the vehicle?
`A. I removed `em. I took `em out.
`Q. How far from the car did you move Mr. Bergquist?
`A. Three foot. Just right outside the door.
`Q. What about Mrs. Bergquist?
`A. Um. That poor lady. Oh God. Maybeum, fifty foot, maybe.
`Q. Did you move her close to anything, a tree, a landmark or anything?
`A. I don't even remember. I don'tI don't remember. I just remember moving her and I remember pulling her away from the car and, um, laying her down. I didn't throw her down, I justI'm gonna takeI just wanted toI wanted to make her come back, you know. I really did. Um, and I, um, I left and I got in the car and I drove off and that's when I went to the parking lot. I can't even tell you whereI can't even tell you where I even left the car. I just know thatfrom what ya'll said on the, on the T.V. I justI don't know, I just, um, I, I just can't remember. I
`Q. You don't remember?
`A. I remember walking away and I remember walking across the street and, um
`Q. Do you remember what the business was where you parked at?
`A. I didn't then. I know now.
`Q. How do you know now?
`A. From what was said in the paper and, um, um,
`Q. But before you heard the news or read the paper you didn't remember where you had parked the car?
`A. No, sir, I didn't. I just, um I was justI was there and then I was gone. I was there and I was gone, you know, my my mind was moving ninety to nothin', you know, I was just at mixed emotions. I didn't, um, I really didn't care. I just wanted to get away from it, um, I just, um
`Q. After you parked the car if you remember did the walk home seem a long walk or were you close to your home or do you recall?
`A. No, it was long. I give out of breath. I even sat down one time. I remember sitting down one time and, um, I just kind of got my senses back a little bit and, um, knew that I had to get up because if I didn't get up things was gonna be worse, you know, I knew that somebody was gonna come by and see me sitting there and wonder what was going on and, um, I had a
`Q. Where did you have the gun at during this time as you walked home?
`A. Um, in my pants. It was either in my pants or it was in my jacket pocket. I don't even remember that. I just remember that I had it on me. No, it wasn't in my pants, it was, it was in my back pocket. It was in my back pocket was where it was at.
`Q. After you shot the Bergquists did you take anything from them?
`A. I removed Mr. Bergquist's wallet.
`Q. Where was it located at?
`A. In his pants.
`Q. In his pockets?
`A. Yes, sir.
`Q. Do you recall which pocket it was in?
`A. No, sir, I just remember reaching down and gettin' it.
`Q. Can you tell me why you took the wallet?
`A. I justI just reached down and got it, um. Why, I, I don't know. I don't know why I reached down there and got it. I justjust reached down and I got it. I guess maybe I was tryin' toto hide the fact thatI don't know what I was tryin' to hide. I don'tI don't evenI don'tI don'tI don't know why. I really don't.
`Q. All right.
`A. I'm sorry.

*342 `Q. That's all right.
`A. I wish I did.
`Q. That's all right.
`A. I wish I could tell you more but I just don't know anymore.
`Q. To the best of your memory how many times did you shoot Mrs. Bergquist?
`A. I just remember pulling the trigger. I don't know how many times.
`Q. Do you know where you shot her?
`A. No, sir. I just reached around in the back seat and I shot and I saw her slump over and it was
`Q. If you can recall
`A. It wasIt was sickening. It was really sickening.
`Q. If you can recall Mr. Hooks, did you fire the gun until the gun would not fire anymore?
`A. I don't remember. I justI just know I shot. I justI shot and, um,
`Q. All right. Did you take anything from her?
`A. No sir. I didn't want to take anything from her. She reminded me of my mother.
`Q. Reminded you of who?
`A. My mother.
`Q. Yes, sir.
`A. Oh God.
`Q. What clothes were you wearing that day, Mr. Hooks?
`A. The clothes that I've got on.
`Q. Same pants and shirt?
`A. Yes, sir.
`Q. I believe you indicated earlier that you had a jacket on?
`A. Yes, sir.
`Q. Where is that jacket?
`A. A blue jean jacket.
`Q. A blue jean jacket?
`A. Yes, sir.
`Q. Did you also wash that jacket?
`A. Yes, sir.
`Q. And where is it located now?
`A. It's located in the front seat of my pickup truck.
`Q. All right, sir. After you got back to your home Mr. Hooks, after this had occurred, what did you do?
`A. I changed clothes. Um, I either put the clothes in first and Ior I either washed the gun or my hands. I just, I just remember doing that. I don't even remember what order I did `em in. I just was doin it, um, as quickly as I could do it, um, but I don't, I don't remember what order I did it in. I don't know if I washed my hands first or if I washed the gun first or if I washed my clothes first, I don't remember. I justI did do those three things as far as I remember I remember doing those three things.
`Q. Okay. At what point in time did you return the gun back to the Norris woman's residence?
`A. It must have been, um, it must have been, um, around twelve, around noon. Um, I remember going by there and, um, the neighbor's car was there and, um, I didn't want to go in the house with them being there. Um,
`Q. Would they have been the next door neighbors?
`A. Yeah. Um, so um, I left out something. I left there and I remember going to get something to eat at, um, some food place up here on, umwhat is it? Lower, Upper Wetumpka Road?
`Q. Yes, sir.
`A. And I sat there and tried to eat and I couldn't eat and I said well I'll just ride around and wait and wait for them to leavethe neighbors, and, um, so I just drove onsomething just made me drive in that direction and when I got there they wasn't there and I remember getting out and taking the gun and, and, um, wiping it off again and, um, placing it back in Linda's night stand and, um
`Q. What did you do after you left Linda's house?
`A. Um, went to Prattville. I went to Prattville and, um, on my way that's when I heard that, um they had found some bodies and, um, I got scared even worse *343 and, um, I justI didn't want to be away from the radio. I just wanted to hear ifthat they was alive and, um, I justI told Paul that, um, I had to leave again and I rode around up in Elmore and in Deatsville area for, I don't know, it seemed like for ages. Um, I just remember, um, stopping and making a phone call to tell Paul that I'd be back to get him and he wouldn't have to worry about, um, having to call somebody from the office to come get him cause I knew if he did, um, if he did I'd lose my job.
`(UNINTELLIGIBLE) Um, and I picked him up at 3:30 and, um, we went back to the office about fifteen minutes to four.
`Q. Did you give Paul any reason for your absence?
`A. Um, yes, sir. I told him that, um I had to appear in court that day and I don't know why I told him I had to appear in court. I guess maybe that I thought that that was about the best excuse I could have not to be on a job without him asking a bunch of questions. Um, and of course when I went back the second time, um, when I told him that I had to leave again, um, I made the same statement to him, that I had to go back and, um, he went on and ate and then I left, um, there and that's when I started riding.
`Q. Did you have any contact with Paul on yesterday's date? That would have been Saturday the 17th, 1984?
`A. Yes, sir.
`Q. And where did this contact take place?
`A. I went by his home and talked to him.
`Q. And what was the topic of conversation?
`A. That, um, I had been called and, and questioned, um, concerning some things, um, which related was to the (UNINTELIGIBLE) and that, um, I wasn't gonna be able to account for my time that I was from work and that the, um, accident that had taken place had taken place from the from thethe times that I was gone and I asked him what he thought about telling someone that I was at work all day, and the times that I had left and the times that I was there and, um, I didn't force the man. I know that he might have felt like I was pressuring him but I didn't pressure him so, um, if he goes, if he has to go to court I didn't pressure him. Make a note of that. I didn't pressure the man in any way, form or fashion. I just asked him, um, straight out what he would do if he was asked. And he had mixed emotions about it, um, as to whether or not he should or he shouldn't and, um, um,
`A. Did he ever give you an answer what he would do?
`A. Yeah, he said that he would.
`Q. When you questioned Paul concerning would he cover for you did you just say did you just say if somebody asked you or did you indicate any specific person?
`A. I, um, specificallyI didn't start out pecifically (sic). I did toward the end. I told him that, um, I told him that if I wasn`t at work Monday that I would probably be picked up for murder and told him that the possibility would be that ya'll would have to question him concerning my being there or not being there concerning this. And, um, he, um, he said that he would. Like, I said, he said that he would, but, um, in all honesty I was hoping that he wouldn't have to, you know. I don't want anybody to lie for me, um,
`Q. Yes, sir.
`A. Just, um,
`Q. Mr. Hooks, at this time do you know where the wallet is that belongs to Mr. Bergquist?
`A. Yes, sir.
`Q. And where is that?
`A. It's in the trash dumpster behind 540 Clay Street, which is the address for my employment.
`Q. Which is?
`A. Home Improvers.
`Q. How is it in that dumpster?
`A. It's in a McDonald's sack. Um, like I said, it should be toward the top, um, unless somebody's throwed anything else in there between Friday and today. It should be in there. Um,
*344 `Q. Did you remove anything out of the wallet?
`A. No, sir, didn't remove anything. I opened it up, I looked at it and, um, wiped it off and I put it in the bag and threw it in the trash can.
`Q. All right. When you left your residence on Friday morning with the Bergquists did you intend on shooting them?
`A. No, sir, I didn't. I really didn't. It justit was just ajust aI don't know I felt like that if I had the gun either I really didn't intend to do it. If I didn't have the gun that would take place when I got there and there wasn't a warehouse. I really don't even remember why I said let's go to the warehouse. I don't even know why I really directed `em to there. I guess I was just looking for somewhere out of the way where I wouldn'twhere we wouldn't be seen or something. I don't know. It was justif I would have just thought for that one second before I pulled that gun out instead of just being under so much pressure I wouldit was unreal. I justI couldn't think. I justit was just an impulse.
`Q. Whatyou've mentioned pressure. If you would, describe what type of pressure you were under at this time.
`A. I've got financial pressure, I've had problems at home. Um, my mental capacity to think has changed so much in the last four months it'sit'sit's unreal. Itit's, um,you know, like I would stand there and try to figure on something and I couldn'tI couldn't even figure anymore. It was just like I didn't even have a brain to think with anymore and I'm sure I do but it justat times it was just from one it seemed like I was there and then I wasn't, you know.
`Q. All right.
`A. And that I had noticed it in the last four months it was doing something. I had noticed something was happening to me. It may be if I would have just asked somebody for some help instead of trying to be Mr. Joe Hooks and, um, take every damn thing on myself it wouldn't have come out like this.
`Q. Mr. Hooks, at this time do you feel like you need some type of mental help?
`A. I would think so, wouldn't you? Wouldn't you? I would, yeah. I would.
`Q. Have you ever received any type of mental help in the past?
`A. Yes, sir.
`Q. Where was this at?
`A. Tuskegee Institute, Veteran's Hospital. It was right right after I got back out of service.
`Q. What branch of the service were you in, Mr. Hooks?
`A. The Army.
`Q. Did you serve time in Vietnam?
`A. No, sir, I never got that far. I was in Germany.
`Q. Yes, sir.
`A. Dishonorable discharge for drugs.
`Q. When were you at the V.A. in Tuskegee if you recall?
`A. It must have been '70. 1970, '71. Um, um, I would just have tomy parents would know.
`Q. Do you recall how long your stay was?
`A. Um, six months, maybe. I think it was six months. Could, um, could I use the bathroom?
`Q. Okay.
`A. Hu?
`Q. Yeah.
`A. Right here?
`Q. No. If you need to go to the bathroom
`A. I do.
`Q. you can go.
`A. I really do.
`Q. Okay.
`A. I really do.
`Q. At this time Mr. Hooks has requested to use the bathroom at 2:40 a.m. so at this time we will go to the restroom.
*345 `(WHEREUPON, THE FOLLOWING OCCURRED IN OPEN COURT IN THE PRESENCE OF THE JURY:)
`MR. MADDOX: Your Honor, we need to turn the cassette over at this time.
`(BRIEF PAUSE)
`Your Honor, for the record, Mr. Law and I have agreed to stipulate that the sound they are hearing is from the cassette, which was made contemporaneous with the video tape, but the machines run slightly at different speeds and so there is a needand also the cassette ran out of tape and had to be turned over at the point that the bathroom break was taken and thus they have to be resynchronized and played to complete the statement.
`THE COURT: That's being done.
`(BRIEF PAUSE)
`(WHEREUPON, STATE'S EXHIBIT ONE CONTINUED AND WAS TRANSCRIBED FURTHER AS FOLLOWS:)
`Q. At this time we have returned from the second floor restroom here at the police department and the time is 2:42 a.m. on the 19th of November.
`Mr. Hooks, I just have a few more questions. And at this time I'd like to know when you left your residence with the Bergquists did you intend to rob them of any money or property?
`A. No, sir. No, sir.
`Q. When you pulled the gun and shot the Bergquists did you intend to kill them?
`A. I don't know.
`Q. Okay.
`A. I don't know. I just, um,
`Q. I think you touched on it earlier but was there any particular reason for the shooting? Why did you consider that was your only alternative?
`A. Because I knew that I wouldn't be able to do the man's job for him and do it right because I had had to use the money to clear up some material debts that was utilized off of other jobs when I was self-employed where the people would finish paying me on my contract. I only did verbal, verbal contracts with the people. Mr. Bergquist was the first person that I had done on a written-type contract and, um, like I said, the others were just verbal, and, um evidently the people knew that, you know, once they gave me a third of it or a half of it, that, um, legally they wouldn't have to pay me the rest of it because there wasn't any, um, account for the amount, um, plus they knew that I didn't have a license to do work in the city for individuals and they knew that, I guess, if I caused them any problems then all they would have to do would be just to report me to the Better Business Bureau or the, um, somebody and, and, basically get me in trouble with the City.
`Q. Yes, sir. Did you plan to do what happened?
`A. No, sir. I didn't. I really didn't. Um, they was just ait was just a spur of the moment thing, um, I don't know if it was because I was, um, was, um, smoking and taking pills that it actually occurred in my mind. I had even thought about sittin' down with the man and explaining the situation which that would have been a lot better than what took place, um, but I knew that there was no way that I could come up with the money for it because it takes everything with my working and my wife working to, um, support usbuying a home and my sonand, um, it's just not any room for any extras there. It's always live from paycheck to paycheck and, um, I was doing this work on the side to try to make up some extra money to have some of the things that we wanted instead of needed. You know, it always seemed like it backfired in my face, you know, and I justit seemed like the harder I tried the worser things got, you know.
`Q. To the best of your knowledge how did Mr. Bergquist come about contacting you for your services?
`A. He contacted me through the Bulletin Board to the best of my knowledge. That was how he got my name and number.
`Q. All right. You mentioned that he has paid you a sum of money. Do you recall what the amount was and when you received this money?
*346 `A. Yes, sir. It was twelve fifty, twelve hundred and fifty dollars on October the 3rd, the night of October the 3rd.
`Q. And this was to be used for your services at his residence I assume?
`A. That's right.
`Q. All right, sir. Do you recall anything concerning the time that you parked the car in the area that it was found in?
`A. Would you repeat that please?
`Q. Okay. The area where the car was parked, where you parked the car, do you recall anything? You had stated earlier that part was unclear.
`A. No. I justI justlike I say, I just remember getting out of the car and, and turning around and I, I just walked fast, I was walking just as fast as I could walk.
`Q. Do you recall seeing anyone in particular?
`A. No.
`Q. Do you recall nearly having a traffic accident?
`A. No, sir.
`Q. Do you recall almost running over a pedestrian? A person walking in the parking lot?
`A. No, sir. Did that happen?
`Q. I'm, I'm asking you.
`A. No, sir, I don't remember it. I truly don't. I don't
`Q. Mr. Hooks, have you given me this statement that we are now taking voluntarily? Of your own free will?
`A. Yes, sir.
`Q. Have I threatened you for this statement?
`A. No, sir.
`Q. At this time if there's anything, anything at all that you would like to tell me I am gonna give you this time to tell me anything that you would like to say about anything.
`A. That if there's any way that, um, my family can help Mrs. Bergquist, um, I hope that it'sthat, um, it can be made possible to her. I hope that she don't die. I'd like to give her my life now and someone take mine. Um, I'd like to be able to be with my wife and son for as long as I could before I go to prison because I know that there's no way out of it. I know it's coming and I'm gonna prepare myself for it, or try to anyway. I didn't even get to tell my son bye. That's all, just God forgive me if possible.
`Q. All right, Mr. Hooks.
`This will be the end of the statement taken from Mr. Joseph B. Hooks, white male, date of birth 11/29/51. I'm Investigator J.W. Barnes. The date is still November the 19th, 1984, the time is 2:51 a.m.'
The first witness for the defense was Laura Cardin, a registered nurse in Tallassee, Alabama, who testified that she had known the appellant for twenty years. In the late 1970's, the appellant came into the emergency room at the hospital complaining of an overdose. He was placed in intensive care and he remained in the hospital for three weeks.
Richard Davis testified that he knows the appellant and has seen the appellant use marijuana, PCP and speed. The appellant's use of marijuana became more frequent right before the shootings. Around 6:30 on the morning of November 16, 1984, the appellant came by Davis's house. Davis saw the appellant lacing a marijuana cigarette with what he thought was PCP. The appellant was edgy that morning but he acts normally when under the influence of PCP.
David Hooks, the appellant's brother, stated that the appellant started sniffing glue at age 13. In high school, the appellant used and sold drugs. The appellant received an undesirable discharge from the Army because of his drug use. After the Army service, the appellant continued to use drugs and acquired a bad reputation for drugs.
Hooks testified that his brother was hard to get along with when he was on drugs. When Hooks saw his brother in August of 1984, the appellant was hyperactive, agitated and deceptive. This was an indication to Hooks that the appellant was on drugs at that time.
*347 Linda Norns testified that the appellant's brother called her one month after the appellant's arrest and told her that the appellant's confession had been forced. The defense then rested its case.
On rebuttal, Allen Adair, a criminalist with the Department of Forensic Sciences, stated that he examined seven tablets which were found in a box in the appellant's bedroom. None of these tablets contained any controlled substances.
At the sentence phase of the trial, the State offered the evidence presented during the guilt phase. The trial judge also granted a motion for a directed verdict on Count 1 at the sentence hearing.
The appellant's father, Joseph Hooks, Sr., testified on behalf of the appellant. He stated that the appellant has a split personality and has seen various doctors for his mental problems. Hooks testified concerning the appellant's problems with drugs and stated that he noticed a significant change in the appellant's personality several months before the shootings. Hooks asked for mercy on behalf of the appellant.

I

A
The appellant contends his videotaped statement should have been suppressed because it was based on earlier statements made by the appellant during interrogation by the police before he had been advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The appellant was called at his home at approximately 11:00 p.m. on the night in question and asked to come to police headquarters concerning the Bergquist case. The appellant agreed and left his home, accompanied by his wife, approximately one hour later. On their way to the police station, they were followed by an unmarked police car, driven by Officer Barnes, who was in the area to make sure the appellant didn't flee.
Upon arrival at police headquarters, the appellant was interviewed by Barnes. His wife was present at this time. The appellant denied any knowledge of the victims' shootings and gave Barnes his alibi. He then voluntarily agreed to be photographed and fingerprinted. During this time, the police learned that the appellant's alibi did not check out. The appellant was then asked to come into another room where he was advised of his Miranda rights. The appellant waived those rights and admitted some knowledge of the shootings. A videotape of the appellant's statement was then made.
The appellant asserts that he should have been advised of his rights before he was initially interviewed by Barnes concerning his acquaintance with the victims and any knowledge he had concerning their shootings.
Miranda warnings are not necessarily required to be given to everyone whom the police question. Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). Miranda is only applicable when an individual is subjected to custodial interrogation. Davis v. Allsbrooks, 778 F.2d 168, 170 (4th Cir.1985); Primm v. State, 473 So.2d 1149, 1158 (Ala. Crim.App.), cert. denied, 473 So.2d 1149 (Ala.1985). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612.
There is a distinction which must be made between general interrogation and custodial interrogation since Miranda is inapplicable when interrogation is merely investigative rather than accusative. Kelley v. State, 366 So.2d 1145, 1148 (Ala. Crim.App.1979); Primm, supra, at 1158; Johnston v. State, 455 So.2d 152, 156 (Ala. Crim.App.), cert. denied, 455 So.2d 152 (Ala. 1984). This distinction should be made on a case-by-case basis after examining all of the surrounding circumstances. United States v. Miller, 587 F.Supp. 1296, 1299 (W.D.Pa.1984); Johnston, supra, at 156; Warrick v. State, 460 So.2d 320, 323 (Ala. Crim.App.1984); *348 Hall v. State, 399 So.2d 348, 351-52 (Ala.Crim.App.1981); Kelley, supra at 1149.
The United States Supreme Court in California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) articulated "the standard by which `custody' is to be judged." Davis, supra at 171. In its opinion, the Supreme Court stated that "although the circumstances of each case must certainly influence a determination of whether a suspect is `in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, supra, 463 U.S. at 1125, 103 S.Ct. at 3519-20 (quoting Mathiason, supra, 429 U.S. at 495, 97 S.Ct. at 714). See also Primm, supra, at 1158.
A determination of "custody" is not based on "the subjective evaluation of the situation by the defendant or the police officers." Davis, supra at 171. Where there has not been a formal arrest (as here), an objective test is used to determine whether the suspect's freedom of action has been restricted by the police in any significant manner. Davis, supra at 171; Miller, supra at 1299; Warrick, supra at 322; Hall, supra at 351. "The only relevant inquiry is how a reasonable man in the suspect's position would have understood his position." United States v. Jonas, 786 F.2d 1019, 1022 (11th Cir.1986) (quoting Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984)).
"Pertinent factors to be considered include (1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. United States v. Crisco, 725 F.2d 1228, 1231 (9th Cir.), cert. denied, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); [U.S. v.] Booth, 669 F.2d [1231] at 1235 [(9th Cir. 1981) ] United States v. Curtis, 568 F.2d 643, 646 (9th Cir.1978)."
United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir.1985).
In the case at bar, the appellant was called on the telephone and asked to come to the police station. He voluntarily agreed to come to the station and talk with the police. He arrived at the station, in his own car, accompanied by his wife, approximately one hour after he was called by the police officer. Thus, the way that the appellant was summoned does not indicate any restriction on his freedom of action. Jonas, supra at 1022; Oregon v. Mathiason, 429 U.S. at 495, 97 S.Ct. at 714; Rodgers v. Lincoln Towing Service, Inc., 596 F.Supp. 13, 16 (N.D.Ill.1984).
The fact that Officer Barnes was in the appellant's neighborhood in an unmarked car and followed the appellant to headquarters does not necessarily convert the interrogation of the appellant into a custodial interrogation. Neither does the fact that Barnes could have stopped the appellant if he had attempted to flee. The appellant only surmised the car following him was an unmarked police car and the fact that he may have been stopped if he attempted to flee was never communicated to him. See Harris v. State, 376 So.2d 773, 777 (Ala.Crim.App.), cert. denied, 376 So.2d 778 (Ala. 1979).
Prior to the time when the appellant was informed that his alibi had fallen through (at which time he was given his Miranda rights), he was not confronted by the police with evidence of his guilt. He was merely asked about his relationship with the victims and if he had any knowledge of the shootings and his alibi.
Thus, the interrogation of the appellant (up until the time he was given his Miranda rights) was investigative rather than accusative. The appellant's name was included on a list of numerous people whom the police had or wanted to talk to in connection with this case. The police were in the process of general investigation when the appellant was first interviewed. Miranda is not applicable to investigative interrogations. Kelley, supra at 1148; Johnston, supra at 156; Primm, supra at 1158; Inzer v. State, 447 So.2d 838, 847 *349 (Ala.Crim.App.1983), cert. denied, 447 So.2d 850 (Ala.1984).
Although the interrogation of the appellant took place at police headquarters, this setting does not necessarily indicate custody or trigger the application of Miranda, supra. Oregon v. Mathiason, 429 U.S. at 495, 97 S.Ct. at 714; Kelley, supra at 1149; Miller, supra at 1299.
The length of the interrogation period (prior to the time the appellant was given his Miranda warnings) is not exactly clear from the record. However, the appellant arrived at the police station at midnight and his videotaped statement began at 2:00 a.m. Thus, the maximum duration of his interrogation was two hours. The appellant, though, was certainly not interrogated for this entire period because he was photographed and fingerprinted during this time. Therefore, the fourth factor doesn't imply custody.
There was no pressure applied on the appellant to detain him. "Though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, see e.g. Mathiason, 429 U.S. at 495, 97 S.Ct. at 714, [U.S. v.] Stanley, 597 F.2d [866] at 869 [ (4th Cir.1979) ], it is not a talismanic factor." Davis, supra at 171-72. The appellant was asked to come to the police station and, once there, he was never told he was not free to leave or told he had to stay. Barnes stated that the appellant was not restrained in any manner while at the station and was free to terminate the interview at any time. "Where, as here, the entire context indicates a lack of custody, failure to inform the defendant of his status is not dispositive." Davis, supra at 172. See also Jonas, supra at 1022; Harris, supra at 777; Conn. v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).
The fact that the appellant was a suspect or that the investigation had focused on him when he arrived at the police station is not determinative of custody. Oregon v. Mathiason, 429 U.S. at 495, 97 S.Ct. at 714; Harris, supra at 777; Warrick supra at 323; Kitchens v. State, 445 So.2d 1000, 1003 (Ala.Crim.App.1984). Neither does the fingerprinting of the appellant necessarily indicate custody (particularly as here, when the process was voluntary). See Harris, supra, at 776.
In the case at bar, the appellant was not formally arrested until after he gave his videotaped statement. Prior to the time he was given Miranda warnings, he was not deprived of his freedom of action in any way. The facts fail to reveal a restriction on the appellant's freedom of movement of the degree associated with a formal arrest. See United States v. Levesque, 625 F.Supp. 428, 439 (D.N.H.1985). Thus, the appellant was interrogated in a non-custodial setting prior to his video statement, and thus, Miranda was not applicable. After he was advised of his Miranda rights, he gave his videotaped statement. The motion to suppress this statement was, thus, properly denied.

B
The appellant contends his videotaped statement was involuntarily given because it was induced by a promise of bond by Officer Barnes.
Clearly, "[a] confession may be inadmissible if induced by a promise to let the accused out on bail, to assist in providing bail, or by a promise to reduce bail. Machen v. State, 16 Ala.App. 170, 76 So. 407 (1917)." Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978).
Officer Barnes testified that he did not remember any mention of bond to this appellant. He stated that, had the appellant asked about bond, he would have informed the appellant that bond was a matter for the district attorney and not a police function and that there was no bond in a capital case. Barnes explicitly denied leaving the appellant during his interview to contact the district attorney concerning bond.
The appellant stated that Barnes told him there was a "possibility of making bond" (R. 106) and that he would not have made a statement if he had not been promised bond by Barnes. The appellant's ex-wife, Karen Hooks, remembered Barnes saying he would talk to the district attorney *350 concerning bond. However, she could not recall whether Barnes made this statement the night of the appellant's video statement or the following Tuesday.
David Hooks, the appellant's brother, testified that the appellant told him that he hoped he would be out on bond by Christmas. Barnes told Hooks that he would talk to the district attorney but he could not promise anything. This occurred on the Tuesday after the appellant's statement.
As can be seen, the evidence is in dispute as to whether there was any discussion concerning bond between Barnes and this appellant.
"The findings of a trial court on a motion to suppress are binding on this Court unless they are clearly erroneous. United States v, Gunn, 428 F.2d 1057, 1060 (5th Cir.1970). The trial judge's determination of the voluntariness of a confession `is entitled to great weight on appeal and will not be disturbed unless it appears to be contrary to the great weight of evidence and manifestly wrong.' Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). `When confessions are admitted on controverted questions of fact, this court will not revise the rulings of the lower court, admitting them, unless they appear to be manifestly wrong.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1947); Thompson v. State, 347 So.2d 1371, 1375 (Ala.Crim.App.), cert. denied, Ex parte Thompson, 347 So.2d 1377 (Ala. 1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978). `We know of no principle which will authorize us, in this case, to depart from the rule laid down above.' Bonner v. State, 55 Ala. 242, 247 (1876)."
Simmons v. State, 428 So.2d 218, 219 (Ala. Crim.App.1983).
The record clearly establishes that the appellant was advised of his rights and waived those rights prior to making his statement. Barnes stated that there were no promises, hopes of reward, threats or other inducements made to the appellant in order to obtain his statement.
Based on the totality of the circumstances here, we find that the trial judge's decision regarding the voluntariness of the appellant's statement was correct. Thus, the appellant's motion to suppress was properly denied.

II
The appellant contends his videotaped statement was the fruit of an illegal arrest. This argument has no merit.
First of all, the appellant was not formally arrested until after he made his videotaped statement. Secondly, the police had probable cause to arrest the appellant before he made his statement based on the letters found in the victims' car and the fact that his alibi was proven false. Thus, the videotaped statement did not result from an illegal arrest.

III
During the presentation of its case-in-chief, the State played a videotape recording of the scene of the crime. The audio and video portions of the tape were played for the trial jury. The appellant now claims on appeal that the audio portion of the videotape constituted inadmissible hearsay and, thus, should have been excluded.
"The hearsay rule is among those rules sometimes invoked against admission of videotape evidence. Any audio narration on a videotape is subject to attack on hearsay grounds, for instance, unless the narrator is present at trial and available for cross-examination. The presence and availability of the narrator, however, cures that objection." Videotape Evidence in the Courts1985, Videotape Evidence Subcommittee, ABA Section of Litigation, Trial Evidence Committee, 26 S.Tex.L.J. 453, 454-55 (1985). See generally, 60 ALR 3d 333, 58 ALR 3d 598.
In the case at bar, prior to the introduction of the videotape into evidence, the State presented the testimony of Officer Wicker, who videotaped the scene. Wicker properly authenticated the videotape and identified the narrator of the tape as Corporal *351 Smith. However, Corporal Smith was never called as a witness in this case.
Thus, since Smith, the narrator of the videotape, was not present at trial and available for cross-examination, the audio portion of the videotape should have been excluded[1] on hearsay grounds, upon proper objection by defense counsel. See Wilson v. Piper Aircraft Corporation, 282 Or. 61, 577 P.2d 1322 (1978).
Although the record clearly shows that defense counsel did object to the admission into evidence of the videotape, the record indicates his objection was not on hearsay grounds. Prior to the playing of the videotape for the jury, defense counsel requested a hearing outside the presence of the jury. The record reflects that such a hearing was held but it does not contain a transcript of the hearing. Following the hearing, the trial judge stated, "He objects and I overrule." (R. 214). He then admitted the videotape into evidence and allowed it to be played to the jury.
Following the playing of this videotape for the jury, Wicker further testified that he had made a videotape recording of the victims' car in the Family Mart parking lot where it was found. When the State offered this tape into evidence, the following discussion took place:
"MR. LAW: Judge, I'd like to approach the bench, if I may.
"(WHEREUPON, THE FOLLOWING OCCURRED AT THE BENCH:)
"MR. LAW: I object to this again. I further objectif there's anyit's blatant hearsay, the voiceI didn't realize there was so much oral on the other
"THE COURT: Is there any talking on this one?
"THE WITNESS: Yes, sir, there is.
"MR. LAW: I object to that, Your Honor.
"THE COURT: Sustained. You can play it without the sound." (R. 223)
The above discussion leads us to infer that defense counsel's objection to the videotape of the crime scene was not on hearsay grounds and, thus, the only objection on record concerning this videotape was a general one. An overruled general objection is insufficient to predicate error on appeal unless the evidence objected to is patently inadmissible. Brown v. State, 392 So.2d 1248 (Ala.Crim.App.1980), cert. denied, 392 So.2d 1266 (Ala.1981); Todd v. State, 380 So.2d 370 (Ala.Crim.App.1980); Stephens v. State, 451 So.2d 402 (Ala.Crim. App.1984). The audio portion of the videotape was not patently inadmissible. As we stated earlier, any narration on the audio portion of a videotape is admissible (against a hearsay objection) if the narrator testifies at trial.
Thus, since the audio portion of the videotape was not patently inadmissible, the failure of defense counsel to object to its admission on hearsay grounds bars our consideration of this issue on appeal. Godfrey v. State, 383 So.2d 575 (Ala.Crim. App.), cert. denied, 383 So.2d 579 (Ala.), cert. denied, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980); Baldwin v. State, 49 Ala.App. 724, 275 So.2d 702 (1972), cert. denied, 290 Ala. 257, 275 So.2d 704 (1973).
However, since this is a death case, we must review the error before us to see if it constitutes plain error and, thus, should be noticed despite the lack of a proper objection by defense counsel. Rule 45A, A.R. A.P. In considering what constitutes "plain error" in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what is "plain error." See Ex parte Harrell, 470 So.2d 1309 (Ala.1985); Ex parte Womack, 435 So.2d 766 (Ala.1983).
In United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court stated that the plain error doctrine should be used to correct only "particularly egregious errors" (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)) which are those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings" (quoting United States v. Atkinson, 297 U.S. 157, 160, *352 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). Young, supra, 105 S.Ct. at 1046-47. The plain error rule should be applied "solely in those circumstances in which a miscarriage of justice would otherwise result." Young, supra, 105 S.Ct., at 1047 (quoting Frady, supra, 456 U.S. at 163, n. 14, 102 S.Ct. at 1592, n. 14).
Furthermore, the court noted that the plain error doctrine requires that the "claimed error not only seriously affects `substantial rights' [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice." Young, supra, 105 S.Ct., at 1047, n. 14.
Although the error before us does affect substantial rights of the appellant (the right to cross-examine the witness against him), we do not find that the playing of the audio portion of the videotape had any impact, much less an unfair, prejudicial impact, on the jurors' deliberations.
According to Wicker, Smith's narration was merely a description of what the videotape was showingthe crime scene area and the victims' bodies. None of the matters included in Smith's narration were in dispute. The narration merely allowed the jurors to hear a description of what they were seeing with their own eyes.
Thus, the admission into evidence of the audio portion of the videotape of the crime scene did not undermine the fundamental fairness of the appellant's trial or contribute to a miscarriage of justice. The error before us did not rise to the level of "plain error." See also Coulter v. State, 438 So. 2d 336 (Ala.Crim.App.1982), affirmed, 438 So.2d 352 (Ala.1983).

IV
The appellant asserts that the trial judge erred by failing to charge the jury that excessive intoxication can produce insanity. The trial judge refused to give this charge on the basis that there was not any evidence presented at trial of insanity due to intoxication.
"Voluntary intoxication is no defense to a charge of assault and battery, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Maddox v. State, 31 Ala.App. 332, 334, 17 So.2d 283 (1944). `Emotional insanity or temporary mania, usually due to causes such as intoxication, not associated with disease of the mind, does not constitute insanity.' Johnson v. State, 43 Ala.App. 224, 226, 187 So.2d 281 (1966). See also Beasley, supra; State v. Bullock, 13 Ala. 413 (1848). `(I)nsane conduct or mania resulting merely from present intoxication is not the insanity which excuses crime.' James v. State, 193 Ala. 55, 69 So. 569, 572 (1915). `Temporary insanity which arises from present voluntary intoxication is no defense to a criminal charge. . . . On the other hand, if the accused is suffering from a settled or fixed insanity, even though caused by long-continued alcoholic indulgence, the rule is the same as in the case of insanity arising from any other cause.' 21 Am. Jur.2d Criminal Law Section 54 (1981). See also Annot. 8 A.L.R.3d 1236 (1966)."
Lister v. State, 437 So.2d 622, 624 (Ala. Crim.App.1983).
"Drunkenness may be said to have two degrees in its effects upon the memory and discretion. The one of these is mere intoxication. No degree of this will palliate or excuse, where it is the effect of the voluntary act of the defendant. The State v. Bullock, 13 Ala. 413.... The other effect of drunkenness is mental unsoundness, brought on by excessive drinking, which remains after the intoxication has subsided. This latter mental unsoundness, if it exists to such excess that the accused loses the government of his reason, may be interposed as a palliation or excuse for crime. United States v. Drew, 1 Lead.Cr.Cas. p. 115, and notes."
Beasley v. State, 50 Ala. 149, 152 (1873).
The law concerning drug intoxication is the same as for alcohol intoxication. See Commentary, § 13A-3-2, Code of Alabama 1975. "[T]emporary insanity *353 resulting from drug abuse will not relieve the user from criminal responsibility, but... insanity of a fixed or permanent character brought on by narcotic drug abuse may effectively negate the user's responsibility for criminal acts." 21 Am.Jur.2d Criminal Law, § 55 (1981).
"The question of whether there is any evidence to substantiate a plea of insanity is a question of law for the court. Knight v. State, 273 Ala. 480, 489, 142 So.2d 899 (1962); McKinnon v. State, 405 So.2d 78, 80 (Ala.Cr.App.1981). Where there is no evidence to establish the plea of insanity, the trial judge may instruct the jury that there is no evidence which would justify a finding of not guilty by reason of insanity and remove that issue from their consideration. Griffin v. State, 284 Ala. 472, 475, 225 So.2d 875 (1969); Walker v. State, 269 Ala. 555, 114 So.2d 402 (1959). `The trial court should not submit the issue of insanity to the jury unless there is evidence to sustain the plea.' Darrington v. State, 389 So.2d 189, 190 (Ala.Cr.App. 1980). Requested charges submitting the defense of insanity to the jury are properly refused where there is no evidence tending to show that the accused was insane. Snead v. State, 251 Ala. 624, 628, 38 So.2d 576 (1949); Pilley v. State, 247 Ala. 523, 528, 25 So.2d 57 (1946); Johnson v. State, 247 Ala. 271, 275, 24 So.2d 17 (1946); Johnson v. State, 169 Ala. 10, 12, 53 So. 769 (1910); Connell v. State, 56 Ala.App. 43, 51-52, 318 So.2d 782, reversed on other grounds, 294 Ala. 477, 318 So.2d 710 (1974); Smith v. State, 32 Ala.App. 209, 211, 23 So.2d 615, cert. denied, 247 Ala. 225, 23 So.2d 617 (1945).
"In determining whether there was sufficient evidence of insanity to warrant the submission of that issue to the jury the trial judge must decide if there was any evidence of legal insanity. That is, was there any evidence that the defendant, at the time of the crime, lacked the substantial capacity as a result of a mental disease or defect to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Alabama Code 1975, Section 13A-3-1."
Young v. State, 428 So.2d 155, 160 (Ala. Crim.App.1982), cert. denied, 428 So.2d 155 (Ala.1983).
Although the appellant produced evidence of longterm abuse, he did not offer any proof that he was suffering from any type, permanent or otherwise, of mental disease or disorder due to his drug abuse. Furthermore, he offered no evidence that he lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as a result of a mental disease or disorder he was suffering from, due to long-term drug abuse. In fact, there was evidence that the appellant was normal except when he was under the influence of drugs. This negates any implication that the appellant suffered any permanent effects from his history of drug abuse.
"Today the great weight of legal authority clearly supports the view that evidence of mere narcotics addiction [or narcotics abuse] standing alone and without other physiological or psychological involvement, raises no issue of such a mental defect or disease as can serve as a basis for the insanity defense."
United States v. Lyons, 731 F.2d 243, 245 (5th Cir.1984).
Thus, since there was no evidence presented of insanity produced by intoxication, the trial judge properly refused the appellant's requested jury charge. Lister, supra.

V
The appellant complains that several statements made by the prosecutor during closing argument of the guilt phase were improper.

A
"He lured those people out, as part of one of the coldest, crudest plans I have ever seen. I think I can imagine

"MR. LAW: I object to what he's ever seen.

*354 "THE COURT: Let's move on. It's argument.
"MR. MADDOX: I withdraw it."
(R. 546) (Emphasis added.)
The appellant contends the above statement was an improper expression of the prosecutor's personal opinion. While we agree with the appellant, a reversal is not mandated here because the appellant was not prejudiced by the remark for two reasons.
First of all, upon the appellant's objection, the prosecutor withdrew his remark. Secondly, the trial court had previously instructed the prosecutor, in the presence of the jury, that he could argue what the evidence revealed but not how he, himself, viewed the evidence. (R. 517).

B
"What this case is about is a man, who in a cold and calculated fashion, set out one Friday morning in November to lure two innocent people into a remote and wooded area of Montgomery County, Alabama and snuff their lives from existence. That's what this case is about. And I'm inflamed about it. Anybody ought to be inflamed about it."
(R. 545) (Emphasis added.)
The appellant also contends this remark was an improper expression of the personal opinion of the prosecutor.
In passing upon the alleged prejudicial closing argument of the district attorney we must look to past cases for our guidance in this matter. We note the following:
"The Supreme Court of Alabama, in Owens v. State, 291 Ala. 107, 278 So.2d 693 (1973), through Jones, J., observed:
"`. . .Statements of the prosecutor, which are merely arguendo of his opinion of the case, are generally within the limits of allowable forensic discussion. Sanders v. State, 260 Ala. 323, 70 So.2d 802 [(1954)], and cases cited therein.'
"In Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973), the Supreme Court, through Faulkner, J., stated:
"`In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, no fixed standard can be applied, and each case must be judged on its own merits. Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968); Bryson v. State, 264 Ala. 111, 84 So.2d 785 (1955). As stated by Judge Harwood, in Bullard v. State, 40 Ala.App. 641, 645, 120 So.2d 580, 584 (1960):
"`"Of necessity a wide discretion must be allowed the trial judge in regulating the argument of counsel. Trials are adversary in nature. Vigorous prosecution and defense is to be expected. Neither defense counsel nor the prosecutor should be too closely hampered by niceties of speech if he is to be effective, but should be permitted to say his say in his own style. This of course does not mean that unfair and prejudicial argument is to be condoned for one instant."`
"We have carefully examined the record in this cause, including the objection and rulings of the trial court, in each of the instances above set forth, and we are of the opinion that reversible error is not here shown. Embrey v. State, 283 Ala. 110, 214 So.2d 567 [(1968)]; Sanders v. State, 260 Ala. 323, 70 So.2d 802 [(1954) ]; Johnson v. State, 272 Ala. 633, 133 So.2d 53 [(1961)].
"As observed by this court in Cazalas v. State, 43 Ala.App. 6, 178 So.2d 562 [(1964) ], cert. denied 278 Ala. 708, 178 So.2d 565 [ (1965) ]:
"`The rule regarding the propriety of jury arguments was stated as follows in Cross v. State, 68 Ala. 476:
"`Every fact the testimony tends to prove, every inference counsel may think arises out of the testimony, the credibility of the witnesses, as shown by their manner, the reasonableness of their story, their intelligence, means of knowledge, and many other considerations, are legitimate subjects of criticism and discussion.'"
"The district attorney here was pointing out the matters of evidence and arguing their legitimate inferences. It is only when a statement is of a substantive, outside factstated as a factand *355 which manifestly bears on a material inquiry before the jury that the court should interfere and arrest discussion."
Barnett v. State, 52 Ala.App. 260, 291 So.2d 353 (1974).
As we stated above, the jury heard the trial judge tell the prosecutor not to argue his view of the evidence. Furthermore, the appellant failed to object to the prosecutor's remark. "While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice. Bush v. State, 431 So.2d 563, 565 (Ala.), cert. denied 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983); cf. Ex parte Harrell, 470 So.2d 1309 (Ala.1985)." Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
Here, we do not find substantial prejudice resulted from the prosecutor's isolated remark. Such is not error to reversal. (Cases herein cited.)

C
"I've listened to Mr. James speak to you and I've listened to Mr. Law speak to you and I've thought back about the evidence that we've heard in this case. Ladies and gentlemen, I've been prosecuting for a while now and I've seen a lot of cases. I've seen a lot of cases investigated and I will tell you this is one of the most thoroughly investigated cases I've seen. There are myriads of physical evidence that were gathered by police officers in the investigation of this case to try to find out who the victims were, what caused their death, who did it, where all the property was, trying to get evidence that would link one step to another. You could hear how we had to have testimony from one man to say I found this item and I turned it over to the next man and then we had him say yes, I got it from him and then I turned it over to Forensic Sciences. Step by methodical step this case has been put together."
(R. 541-42) (Emphasis added.)
The appellant argues that the above statement of the prosecutor constituted a remark that the State only prosecutes the guilty. We disagree. The statement was not an implication that a determination had already been made by the State that the appellant was guilty or he would not have been prosecuted. The statement was merely to the effect that this case had been thoroughly investigated by the police. This was certainly a reasonable inference which the prosecutor could have drawn from the evidence which was presented at trial. Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984). It shows thorough law enforcement procedure.
We must note also that there was no objection to this statement. This fact weighs against any claim of prejudice by the appellant. Kennedy, supra.

D
"Don't you think the Bergquists would have liked to have had the opportunity to tell this man seated over hereI can't call him a man. Mr. Hooks right here, don't you think they would have loved to have had the opportunity to discuss any money conflicts he was having over some cabinets or whatever? They didn't get that chance, did they? They simply didn't get it. They were never ever given the chance." (R. 517) (Emphasis added.)
The appellant asserts that this statement was a disparaging characterization of the appellant not based on the evidence and, thus, was improper.
While we agree that the remark was disparaging, we do not conclude that it is not inferable from the evidence. A prosecutor has the right to present his impressions from the evidence. Barbee v. State, 395 So.2d 1128, 1135 (Ala.Crim.App.1981).
The prosecutor was obviously arguing, through his statement, that a man would not handle his financial difficulties in the same way the appellant handled his with these victims (i.e., by shooting them).
Furthermore, the appellant's failure to object to the prosecutor's characterization *356 of him indicates a lack of prejudice to him. Kennedy, supra.
Viewing the prosecutor's argument as a whole, we do not find that any of his statements, individually or collectively, substantially prejudice the appellant. Thus, no error occurred here. (Authorities herein cited.)

VI
The appellant alleges that it was fundamentally unfair and in violation of due process to allow Lada Lewis, an employee of the district attorney's office, to serve as an interpreter for Ursula Schreiber. He asserts that the State should have been required to make a showing "that a disinterested interpreter who had no connection with any of the parties could not have been found." (Appellant's brief, p. 73). The law in Alabama does not require that an interpreter be the "least interested person available." Robinson v. State, 444 So.2d 902, 904 (Ala.Crim.App. 1984) (interpreter was the teacher and friend of the victim-witness). See also Almon v. State, 21 Ala. App. 466, 109 So. 371 (1926) (interpreter was the mother of the victim-witness); Hyman v. State, 338 So.2d 448 (Ala.Crim.App. 1976) (interpreter was witness's teacher); Brown v. State, 331 So.2d 820 (Ala.Crim. App. 1976) (interpreter had "raised" witness and was his employer); Burgess v. State, 256 Ala. 5, 53 So.2d 568 (1951) (interpreter was brother of witness).
The selection and qualification of an interpreter is within the sound discretion of the trial judge and his decision on this matter should not be overturned absent an abuse of his discretion. Robinson, supra. Thus, the question before this court is whether the trial judge abused his discretion in allowing Lewis to serve as an interpreter in spite of the fact that she was an employee of the district attorney's office in the Victims Service Unit. Although this court has not specifically addressed this question, other courts have held that a person is not disqualified to serve as an interpreter merely because of that person's connection with the prosecution. See State v. Rangel, 169 Kan. 194, 217 P.2d 1063 (1950) (interpreter was used by the State in its investigation); United States ex rel. Torres v. Brierton, 460 F.Supp. 704 (N.D. 111.1978) (interpreter was police officer); People v. Torres, 18 Ill.App.3d 921, 310 N.E.2d 780 (1974) (interpreter was police officer); State v. Coria, 39 Or.App. 507, 592 P.2d 1057 (1979) (interpreter was police officer); LaCount v. State, 237 Ga. 181, 227 S.E.2d 31 (1976) (interpreter was police officer).
The only authority relied on by the appellant in brief is Prince v. Beto, 426 F.2d 875 (5th Cir.1970). In that case, the Fifth Circuit held that it was fundamentally unfair to allow the husband of the victim to serve as an interpreter and that a disinterested interpreter should have been secured. Prince, supra, can be easily distinguished from the case at bar on its facts.
In Prince, supra, the court stated that allowing this husband to serve as his wife's interpreter violated due process because 1) the nature of the charge against the defendant (burglary with intent to commit rape) would "naturally excite the emotions of the husband," 2) the only testimony presented against the defendant came from the wife by way of her husband's interpretations, 3) and the husband offered to stop the prosecution of the defendant if he was paid $100.00. "The trial court's appointment [of the husband as an interpreter] injected an intensely interested party into the center of an emotion-packed criminal trial to interpret the testimony of the only witness to the alleged offense. This conduct is intolerable. Furthermore, the tremendous potential for bias and prejudice inherent in such an appointment is substantially enhanced by the extortion attempt." Prince, supra, at 877.
The only partiality on the part of Lewis, as alleged by the appellant, is her employment with the district attorney's office. He has not shown, nor do we have evidence, that Lewis was involved or even interested in this particular case. We, therefore, conclude that Lewis's employment with the prosecutor alone (especially in light of the minor significance of Schreiber's testimony), did not disqualify *357 her from serving as an interpreter in this case. The appellant does not allege or show any prejudice from the use of Lewis as an interpreter nor can we find that any harm was suffered by him as a result of her appointment.
There was no abuse of the trial judge's discretion in his appointment of Lewis as an interpreter. See United States v. Arbelaez, 719 F.2d 1453, 1461 (9th Cir.1983).

VII

A
During the voir dire of the jurors, the trial judge made the following remarks:
"THE COURT: Would the two ladies and gentleman that have just stood, Ms. Crow and Ms. Miller, would ya'll stand again, please?

"The law provides that it will be up to the court in the final analysis to, if there is a conviction, to make a decision between life without parole and death in a capital case. Understanding that that option will be up to the court would you two ladies still be irrevocably committed against voting for a conviction and the imposition of death?"
. . . . .
"THE COURT: Let me make sure you understand the procedures. There will be a trial. It'll be up to the jury to make a decision as to guilt or non guilt; that is, voting for a conviction or voting to not convict. Then there will be a sentencing stage if there is a conviction in the case. The jury maywe may or may not ask the jury to give a recommendation as to death or life without parole, but whatever the recommendation is, it will still be up to the court as to whether or not the imposition of the death penalty will be imposed. Understanding that, my question now is: Would you not be willing to consider all of the possible penalties as provided by State law? That is to say, would you be irrevocably committed before this trial has begun at this time, without any thought as to the facts that will emerge, to voting against a conviction and the imposition of the penalty of death regardless of the facts and circumstances?" (R. 127-128) (Emphasis added.)
Later, in the course of closing arguments to the jury during the sentencing phase, the following statement was made by the prosecutor:

"The judge is going to charge you that your duty at this time is to render an advisory verdict or opinion to the judge regarding punishment in this case. It's advisory only. It's ultimately up to the judge as to what sentence is imposed." (R. 601) (Emphasis added.)

"We are going to ask you to render a verdict in this case and an advisory opinion asking the judge to give the defendant the death penalty. That is not an easy thing for us to ask you to do. It is not an easy thing for you to do, and it's not an easy decision for the judge, ultimately." (R. 602-03) (Emphasis added.)
The appellant contends on appeal that the remarks of both the trial judge and the prosecutor constitute reversible error according to the United States Supreme Court's decision in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
In Caldwell, supra, a capital case, the prosecutor told the jury during the sentencing stage of the trial that their decision was not the "final decision" and that their "job is reviewable." Caldwell, supra, 105 S.Ct., at 2637. Defense counsel immediately objected and the trial judge then replied, "I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands." Caldwell, supra, 105 S.Ct., at 2638. The prosecutor then reiterated the trial judge's statement that the jury's decision was "automatically reviewable by the Supreme Court." Caldwell, 105 S.Ct. at 2638.
The United States Supreme Court held that the remarks of the prosecutor and the trial judge were an effort to minimize the jury's "responsibility for determining the appropriateness of [the sentence of] death" and the jury's "sense of the importance of its role." Caldwell, supra, 105 S.Ct., at *358 2646. Thus, the remarks were "inconsistent with the Eighth Amendment's heightened `need for reliability in the determination that death is the appropriate punishment in a specific case.'" Caldwell, supra, 105 S.Ct., at 2645 (quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion). The court went on to state that "... it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell, supra, 105 S.Ct. at 2646. The defendant's sentence of death in Caldwell, supra, was vacated by the Supreme Court because they were unable to say that the prosecutor's and the trial judge's remarks "had no effect on the sentencing decision." Caldwell, supra, 105 S.Ct., at 2646.
In the case at bar, we conclude that the remarks made by the trial judge and the prosecutor had no effect on the jury's sentencing decision since the jury returned a recommendation of life without parole. Thus, the decision of the Supreme Court in Caldwell, supra, does not require a vacation of this appellant's sentence.
However, this court is of the opinion that the applicability of Caldwell, supra, to this issue should be addressed by this court (despite its inapplicability to the case at bar) because the issue will often be encountered by this court in other cases (where a jury has returned a recommendation of death).
In its brief, the State seems to urge that Caldwell, supra, is distinguished from the case at bar because the remarks in Caldwell, supra, involved statements about appellate review of a death sentence, while the remarks here concerned the trial court's sentencing authority in a death case. Although the Supreme Court has not specifically addressed this issue,[2] other courts have considered this issue in light of the Supreme Court's holding in Caldwell, supra.
In Frye v. Commonwealth, 231 Va. 370, 345 S.E.2d 267 (1986), the Supreme Court of Virginia explicitly rejected an argument similar to the one asserted by the State here. The court reasoned that such an argument "ignores the sweeping language [of the Supreme Court in Caldwell, supra], prohibiting any argument which leads a jury to believe the sentencing responsibility lies `elsewhere.'" Frye, supra, at 285.
In Frye, supra, the prosecutor made the following remark to the jury:
"Well, ladies and gentlemen of the jury, that load is not on your shoulders, that responsibility is not yours. The Judge will be the person that fixes sentence if you find the defendant guilty as charged and fix his punishment at death. The Court will pronounce sentence."
Frye, supra at 284.
The trial judge, in response to defense counsel's objection to the prosecutor's argument, stated, "[I]t is clearly the law. The jury verdict is a recommendation." Frye, supra at 284.
The Virginia Supreme Court vacated the defendant's death sentence based on the above remarks of the prosecutor and the trial judge. The court held that it was improper to argue to the jury that the trial judge shares the responsibility for the death sentence because such an argument is "misleading because it fails to place before the jury accurate information explaining the limits on the court's power to set aside the jury's verdict."[3]Frye, supra at 286.
*359 The Missouri Supreme Court has also addressed a similar issue to the one before us, in light of Caldwell, supra. In State v. Driscoll, 711 S.W.2d 512 (Mo.1986), the defendant asserted it was plain error for the trial judge to fail to, sua sponte, admonish the prosecutor for making statements to the jury which suggested that the judge and not the jury was responsible for the final imposition of sentence.
The Missouri Supreme Court stated that they had been confronted with a similar issue in Roberts v. State, 709 S.W.2d 857 (Mo.1986).
"The defendant in Roberts argued that it was plain error for the trial court not to have declared a mistrial or admonish the jury when the prosecutor informed the jury that their verdict would serve only as a recommendation to the trial judge.
"In rejecting this argument we began by pointing out that in Missouri, Rule 29.05 vests in the trial court the `power to reduce ... punishment ... for the offense if [the court] finds the punishment excessive.' Consequently we concluded that the prosecutor's statement that the trial judge could reduce the sentence was a correct statement of law. Roberts, at 869. Additionally, we noted that the defendant in Roberts had failed to enter an objection when the prosecutorial comments were made. Roberts, at 869. Furthermore, we found that Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), under the facts of Roberts, did not compel a finding of plain error because Caldwell involved a clearly inaccurate statement of lawwhich was not the case in Roberts. In this same respect, Caldwell is distinguishable from the facts of the present case."
Driscoll, supra at 515.
The Illinois Supreme Court has also confronted the issue before us. In People v. Perez, 108 Ill.2d 70, 90 Ill.Dec. 932, 483 N.E. 250 (1985), the defendant urged a vacation of his death sentence because "the trial judge `repeatedly' misinformed the jury that they would `recommend' whether the death penalty should be imposed." Perez, supra 90 Ill.Dec. at 942, 483 N.E.2d at 260. The Illinois Supreme Court held that the holding in Caldwell, supra, did not command a reversal even though the use of the word "recommend" was inaccurate under State law.[4] The court reasoned that the jurors could not have been "confused as to their responsibility in imposing the death penalty" "[g]iven the limited use of the word `recommend' at the sentence hearing and the fact that the jury's role was clearly and correctly stated in both the judge's instructions to the jury and on the verdict form which each of the jurors signed." Perez, supra 90 Ill.Dec. at 942, 483 N.E.2d at 260.
Thus, the court concluded that, based on the facts, the jurors were not misled to believe that the responsibility for imposition of the death sentence rested elsewhere.[5]
In Matthews v. Commonwealth, 709 S.W.2d 414 (Ky.1985), the Kentucky Supreme Court reviewed the use of the word "recommend" in reference to the jury's verdict, in light of Caldwell, supra. The court held that a reversal was not required because the word "recommend" was used in the statute[6] but cautioned:

*360 "... that although in this area the court and prosecutor must be extremely careful to avoid leaving the jury with any impression that would diminish its `awesome responsibility' in imposing the death sentence (McGautha v. California, 402 U.S. 183, 208, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711 (1971)), use of the word `recommend' is not per se constitutionally impermissible. It is not incorrect as long as the context in which it is used does not mislead the jury as to its role in the process or its responsibility in exercising its sentencing function."
The cases discussed above suggest that remarks, similar to those made by the trial judge and the prosecutor in this case, do not warrant a reversal so long as the remarks are not inaccurate on their face or to the extent that they misled the jury concerning their proper role in the sentencing process.
Here the remarks made were technically correct, and did not tend to minimize the jury's role in Alabama's sentencing scheme, nor could they have confused the jury concerning their responsibility in the sentencing process.
Section 13A-5-47(e), Code of Alabama 1975 refers to the jury's verdict as "advisory" and a "recommendation" and stated that the verdict is "not binding upon the [trial] court."[7] See Jones v. State, 456 So.2d 380 (Ala.1984); Murry v. State, 455 So.2d 53 (Ala.Crim.App.1983), reversed on other grounds, 455 So.2d 72 (Ala.1984). Although the jury's decision concerning sentence is to be given consideration by the trial judge, he may accept or reject that verdict. The trial judge, and not the jury, is the sentencing authority in Alabama.[8]Beck v. State, 396 So.2d 645 (Ala. 1980).
The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra. Alonzo v. Ex rel Booth, 283 Ala. 607, 219 So.2d 858 (1969).

B
The appellant also contends the remarks discussed above were contrary to Alabama law, citing Plyler v. State, 21 Ala.App. 320, 108 So. 83 (1926) and Pilley v. State, 247 Ala. 523, 25 So.2d 57 (1946). Our reasoning as set out above applies to this contention as well.

VIII
During closing argument in the sentencing phase, the prosecutor argued:
"Now they ask mercy for this man who, by their evidence becomes involved in drugs, gets in trouble. They ask mercy for him. I say to you what's to keep him from taking drugs again? Mr. Law says he'll be locked up where he can't get into trouble. I wish that it were true.
"MR. LAW: Your Honor, I object to that argument. That's improper.
"MR. MADDOX: Even in prison
"MR. LAW: Your Honor, I have some law on that. I have some law on that.
"THE COURT: Sustained." (R. 612)
The appellant asserts that the argument of the prosecutor, as quoted above, was improper, citing Ex parte Rutledge, 482 So.2d 1262 (Ala.1984). In Rutledge, supra, the Alabama Supreme Court stated that "... it has long been the law of this State that comments upon the probability or possibility of what might happen under a particular *361 sentence, falling outside the evidence and the law of the case, constitute improper argument." Rutledge, supra, at 1265.
We do not need to determine whether the remarks quoted above were of the type and character condemned by the Supreme Court in Rutledge, supra, because defense counsel's objection to the prosecutor's argument was immediately sustained by the trial court. Any prejudice suffered by the appellant as a result of the prosecutor's argument was eradicated by the trial judge's prompt action. See Meredith v. State, 370 So.2d 1075 (Ala.Crim.App.), cert. denied, 370 So.2d 1079 (Ala.1979).
Furthermore, even if the prosecutor's argument was improper and thus constituted error, the error was harmless since the jury returned a recommendation of life imprisonment without parole. Their recommendation would have been the same with or without the argument of the prosecutor and, therefore, the appellant was not prejudiced by the prosecutor's argument. The harmless error rule is applicable to errors occurring during the sentence phase of a capital case. See Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983).

IX
The appellant contends the trial court improperly rejected the jury's recommendation of life without parole. In his brief, the appellant acknowledges the United States Supreme Court's decision in Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) which holds that a state may constitutionally provide a trial judge with the authority to override a jury recommendation of life imprisonment without parole.
However, the appellant seeks to distinguish Spaziano, supra, from the case at bar on the basis that Spaziano, supra, involved Florida law which places certain limits upon a trial judge's authority to override a jury's verdict of life imprisonment without parole. The appellant alleges that, since Alabama has not adopted similar standards to those employed in Florida, the allowance of a jury override by the trial judge in this state is unconstitutional.
The Alabama Supreme Court rejected this argument in Ex parte Jones, 456 So.2d 380 (Ala.1984). Thus, the Alabama provision which allows a trial judge to override a jury's recommendation is constitutional under Spaziano, supra. Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).

X
The appellant asserts that there was insufficient evidence presented by the State to sustain his conviction on the robbery/murder charge. He contends the State did not prove that the victims' murder occurred during the course of a robbery.
"To sustain a conviction under § 13A-5-40(a)(2) for capital murder-robbery, the State must prove beyond a reasonable doubt: (1) a `robbery in the first degree or an attempt thereof,' as defined by § 13A-8-41, (2) a `murder' as defined by § 13A-6-2(a)(1), and (3) that the murder was committed `during' the robbery or attempted robbery, i.e. that the murder was committed `in the course of or in connection with the commission of, or in immediate flight from the commission of the robbery or attempted robbery in the first degree. § 13A-5-39(2)."
Connolly v. State, 500 So.2d 57 (Ala.Crim. App.1985), affirmed, 500 So.2d 68 (Ala. 1986).
The appellant, in his statement, admits to the killing of the Bergquists as well as the taking of Mr. Bergquist's wallet and the Bergquists' automobile.
"As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), `the fact that the victim was dead at the time the property was taken would not militate the crime of robbery if the intervening time (between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So. 2d 723 (Ala.1979); Clark v. State, 451 *362 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position `would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So. 2d 216 (Ala.1984).
"Although a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra, O'Pry v. State [642 S.W.2d 748 (Tex.Cr.App. 1981) ], supra, the question of a defendant's intent at the time of the commission of the crimes is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr. App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where `[t]he intervening time, if any, between the killing and robbery was part of a contnuous chain of events.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala.1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App.1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980); Clements v. State, 370 So.2d 708 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So. 2d 723 (Ala.1979).
"The question this Court must answer is whether `there was sufficient evidence presented by the State, from which the jury could infer that the appellant was guilty of the capital offense charged, beyond a reasonable doubt.' Clark v. State, 451 So.2d 368, 372-73 (Ala.Cr.App. 1984)."
Connolly, supra.
From our review of the evidence, we conclude that there was sufficient evidence presented at trial which would allow the jury to infer that the victims' murder occurred during the course of a robbery of the said victims. The appellant's statement contained ample references to the financial difficulties the appellant was experiencing at this time. Although the appellant denied taking anything from Mr. Bergquist's wallet, the wallet contained no money when it was found inside a trash dumpster later. The taking of the victims' car and Mr. Bergquist's wallet occurred right after the victims were shot by the appellant. Thus, the circumstances indicate that the offenses were a continuous chain of events and thus, the robbery was not a mere afterthought to the killings. The evidence was sufficient to support the appellant's conviction on the murder/robbery charge and the murder of two or more persons charge. See Connolly, supra; Bufford v. State, 382 So.2d 1162 (Ala.Crim.App.), cert. denied, 382 So.2d 1175 (Ala.1980); Nicks v. State, 521 So.2d 1018 (Ala.Crim.App.1987).

XI
During the sentence phase of the trial, the trial judge gave the following instruction:
"A mitigating circumstance does not have to be included in the list that I've read to you in order for it to be considered by you. In addition to the mitigating circumstances previously specified, mitigating circumstances shall include any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death. A mitigating circumstance considered by you should be based on the evidence you've heard with the factual existence of an offered mitigating circumstances in dispute. The State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. The burden of disproving it is by a preponderance of the evidence, and that means that you are to consider the mitigating circumstance does exist unless taking the evidence *363 as a whole it is more likely than not that the mitigating circumstance does not exist. Therefore, if there is a factual dispute over the existence of a mitigating circumstance then you should find and consider that mitigating circumstance unless you find the evidence is such that it is more likely than not that the mitigating circumstance does not exist." (R. 621-22)
The court's instruction was in accord with § 13A-5-45(g), Code of Alabama 1975, as amended, which provides:
"The defendant shall be allowed to offer any mitigating circumstance defined in sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
The appellant argues that the court's instruction, and the statute, impermissibly place the burden of proving the existence of mitigating circumstances on the appellant. We cannot agree with this argument.
The trial court's instructions and the statute merely require the appellant to interject the existence of a mitigating circumstance into evidence. The cases relied on by the appellant in support of his argument, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), do not bar the imposition of the burden to establish the existence of mitigating circumstances upon the defendant. These cases only forbid the State from limiting any evidence offered in mitigation by a defendant.
"In his concurring opinion in Jacobs v. State, 361 So.2d 640, 647 (Ala.1978), Chief Justice Torbert recognized that `the burden of establishing mitigating circumstances must realistically rest with the defendant (State v. Knapp, 114 Ariz. 531, 562 P.2d 704 (1977); State v. Richmond, supra [114 Ariz. 186, 560 P.2d 41 (1976), cert. denied, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977) ]).' This language was quoted with approval in Richardson v. State, 376 So.2d 205, 224 (Ala.Crim.App.1978), affirmed, 376 So.2d 228 (Ala.1979). In his concurring opinion in Cook v. State, 369 So.2d 1251, 1260 (Ala.1978), Judge Maddox remarked, `I disagree with any suggestion that the burden is on the state or the judge to proffer mitigating evidence the only obligation on the state is, as Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] holds, to permit the defendant to present mitigating evidence. Alabama permits that.'"
Cochran v. State, 500 So.2d 1161 (Ala. Crim.App.1984), affirmed in part, remanded in part, on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985) affirmed on return to remand, 500 So.2d 1188 (Ala. Crim.App.), affirmed, 500 So.2d 1064 (Ala. 1986).
This court's opinion in Cochran, supra, (which interpreted the 1975 Death Penalty Act), stated that it was constitutionally permissible to place the burden of proving the existence of mitigating circumstances on the defendant at trial. Thus, if it is constitutionally allowable to place the burden of proving mitigating circumstances on a defendant, it is certainly permissible to place the burden of interjecting the existence of the mitigating circumstances into evidence on a defendant. Furthermore, placing the burden on the State to disprove the existence of a mitigating circumstance (once interjected into evidence) is proper. We find no error here. Cochran, supra.

XII
During the court's oral instructions to the jury, the trial court stated:
"Now ladies and gentlemen, if after full and fair consideration of all of the evidence in this case you're convinced beyond a reasonable doubt and to a moral certainty that at least one aggravating circumstance does exist and you are convinced that an aggravating circumstance outweighs the mitigating circumstance or circumstances your verdict would be:

*364 We, the jury, recommend the defendant Joseph Hooks be punished by death. The vote is as followsand I've prepared sample jury verdict forms where you are to record the numerical number of your vote for death or life without parole, and it should be signed by the foreperson.
"However, if after a fair and full consideration of all the evidence in this case your determinationyou determine that the mitigating circumstances outweigh any aggravating circumstance that exists or you are not convinced beyond a reasonable doubt and to a moral certainty that at least one aggravating circumstance does exist, your verdict would be to recommend punishment of life imprisonment without parole and the form of that verdict would be: We, the jury, recommend that the defendant, Joseph Hooks, be punished by life in prison without parole. The vote is as followsand once again I have prepared sample verdict forms." (R. 626-27)
The court's instructions were in accord with the language set out in § 13A-5-46(e), Code of Alabama 1975, as amended, which reads:
"After deliberation, the jury shall return an advisory verdict as follows:
(1) If the jury determines that no aggravating circumstances as defined in section 13A-5-49 exist, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;
(2) If the jury determines that one or more aggravating circumstances as defined in section 13A-5-49 exist but do not outweigh the mitigating circumstances, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;
(3) If the jury determines that one or more aggravating circumstances as defined in section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death."
The appellant argues on appeal that the trial judge erred by failing to give instructions, in addition to those quoted above, requiring the jury to determine whether death is the appropriate punishment. This argument is without merit. In Alabama, the determination of whether death is the appropriate sentence is based on the jury's weighing of the aggravating and mitigating circumstances. Thus, after weighing the aggravating and mitigating circumstances and making a decision based on that process, the jury has determined that death or life imprisonment without parole is the appropriate punishment.
Furthermore, any error which might have occurred in the court's instructions to the jury during the sentence phase was harmless because the jury here, after weighing the aggravating and mitigating circumstances, determined life imprisonment without parole to be the appropriate punishment for this appellant.

XIII
During the jury selection process, the trial court, according to the principles set out in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), excluded a venire member based upon the fact that she was irrevocably committed against voting for the death penalty, regardless of the evidence presented. The appellant now asserts that the trial court's exclusion of this prospective juror from the venire violated his right to a fair and impartial jury selected from a representative cross-section of the community, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.
This argument has been specifically rejected by the United States Supreme Court, see Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) as well as by the courts of this state, see Ex parte Neelley, 494 So.2d 697 (Ala. 1986), Wright v. State, 494 So.2d 726 (Ala.Crim.App. 1985); Morrison v. State, 500 So.2d 36 (Ala.Crim.App.1985); Agee v. State, 465 So. 2d 1196 (Ala.Crim.App. 1984), cert. denied, 465 So.2d 1196 (Ala.1985); Clark v. State, 451 So.2d 368 (Ala.Crim.App.), cert. denied, *365 451 So.2d 368 (Ala.1984). Thus, the trial court's action in this instance was proper.

XIV
During the cross-examination of the appellant's brother, David Hooks, by the prosecution, the following occurred:
"Q. What kind of child was your brother?
"A. Just like everybody else, I guess.
"Q. Was he arrogant?
"MR. LAW: Your Honor, objection. Same grounds.
"THE COURT: Overruled.
"A. More so than I was." (R. 495)
The appellant argues that the prosecutor's question was improper. We do not agree.
"The privilege of cross-examination inures to the benefit of the State in a criminal prosecution just as to any other party. Bickerstaff v. State, 369 So.2d 315 (Ala.Crim.App.1979). The scope and extent of such are matters addressed to the sound discretion of the trial court, whose ruling will not be disturbed absent a showing of gross abuse or substantial injury. Trawick v. State, 431 So.2d 574 (Ala.Crim.App.1983); McFerrin v. State, 339 So.2d 127 (Ala.Crim.App.1976); Roberts v. State, 338 So.2d 466 (Ala.Crim. App.1976); Ala.Code 1975, § 12-21-137."
Twilley v. State, 472 So.2d 1130, 1137 (Ala. Crim.App.), cert. denied, 472 So.2d 1130 (Ala.1985).
On direct examination, Hooks testified about the appellant's abuse of drugs from the time he was a teenager. Hooks further testified that the appellant's personality changed dramatically when he was on drugs. Hooks stated that the appellant was easy to get along with when he was not on drugs but became agitated and irritable when he used drugs.
The prosecution, through its question to Hooks on cross-examination, was merely trying to rebut Hooks' testimony on direct examination that the appellant's personality changed for the worse when he abused drugs.
Thus, we find the trial judge did not abuse his discretion by allowing the prosecutor to ask the above-quoted question on cross-examination.
Furthermore, neither the prosecutor's question nor Hooks' response caused substantial injury to the appellant. Rule 45 A.R.A.P. No error occurred here.

XV
Prior to trial, the appellant submitted a list of proposed questions for the jury venire. The following question was among those submitted:
"If any member of the jury venire or anyone in your family or any acquaintances has been treated or affected by mental illness, or drug and/or alcohol addiction, please stand and state your name and the circumstances briefly." (R. 747)
The trial court modified the question somewhat and asked if "anyone on this venire or anyone in your immediate family [had] ever been treated by a psychiatrist or psychologist or anyone for mental illness or drug or alcohol addiction." (R. 150-51). After an objection by the State, the trial court told the jury that they had an expectation of privacy concerning the matters asked by the question and made answering the question voluntary. No one answered the question.
The appellant contends that the trial judge should have required the venire to answer the question propounded to them. Although the appellant concedes in brief that trial judges have broad discretion as to the scope of voir dire questioning, he submits that the trial court abused his discretion here by making a response to his question voluntary.
Whether one has been treated for a mental or emotional illness or for substance abuse is a highly private matter. We fail to see how the trial court's action, in making a response to such an intrusive question voluntary deprived the appellant of an impartial jury. There was no abuse of the trial court's discretion here. See Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958).

*366 XVI
The appellant contends the trial judge incorrectly considered, as an aggravating circumstance, the fact that "[t]he offense was committed while the Defendant was engaged in or was an accomplice in the commission of a robbery." (R. 794). Under Issue X, we held that there was sufficient evidence to support the appellant's conviction for robbery/murder. Section 13A-5-45(e) provides that:
"At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
Thus, the fact that this offense was committed during the commission of a robbery was established by the jury's verdict finding the appellant guilty on the robbery/murder charge. The trial court properly found the one aggravating circumstance as enumerated above.

XVII
The appellant contends the trial judge erred by failing to find that his "emotional or psychiatric problems" (including his drug abuse), his "expression of remorse in his confession" and his "father's love for him and desire to see him live" were mitigating circumstances. The trial court's sentencing order does reflect that the trial judge considered each statutory mitigating circumstance and found none to exist. The order is not clear as to whether the trial court considered the other evidence offered in mitigation by the appellant or whether he found this evidence to be mitigating. The order states that the appellant was "given the opportunity to present any other evidence of mitigating circumstances" in addition to those enumerated in the Alabama statutes. However, the order doesn't state what other evidence was offered in mitigation and, thus, what was considered by the trial court. The order does state that the court "weighed each mitigating circumstance individually and ... weighed the mitigating circumstances collectively" and he found the "aggravating circumstances overwhelmingly outweigh the mitigating circumstances." (R. 795) However, the order does not reflect what mitigating circumstances, if any, the trial judge found. Nor does it reveal what evidence, if any, was considered by the trial court in his determination of mitigating circumstances.
A similar situation was addressed by the Alabama Supreme Court in Ex parte Cochran, supra. In that case, the trial court's order did not state whether the trial judge "considered the evidence offered by the defendant [in mitigation] and then determined it was insufficient or whether he merely precluded it without consideration." Ex parte Cochran, supra. In light of this fact, the Alabama Supreme Court found that they were unable to properly review the trial court's sentencing decision. We, too, are in the same predicament.
Therefore, we must remand this cause to the trial court with instructions that he enter specific written findings concerning the existence or nonexistence of the additional evidence offered in mitigation by this appellant. Ex parte Cochran, supra; Clisby v. State, 456 So.2d 99 (Ala.Crim.App. 1983), affirmed, 456 So.2d 105 (Ala.1984).
For the reasons stated, this cause is remanded with directions.
A return shall be prepared and sent to this court promptly showing these findings by the trial judge.
REMANDED WITH DIRECTIONS.
All the Judges concur.
BOWEN, P.J., concurs in result only.

ON RETURN TO REMAND
TYSON, Judge.
On March 10, 1987, this court rendered its original opinion in this cause but determined that the trial court had not addressed sufficiently "evidence offered by the defendant (in mitigation) and then determined whether it was insufficient or whether he merely precluded it without *367 consideration", in accordance with the opinion of the Supreme Court of Alabama in Ex parte Cochran 500 So.2d 1179 (Ala.1985), aff'd, on return to remand, 500 So.2d 1188 (Ala.Crim.App.) aff'd, 500 So.2d 1064 (Ala. 1986).
Pursuant to our opinion as mentioned, the Circuit Court of Montgomery County has filed its return as directed.
The complete order and judgment of the trial court setting forth its determinations with reference to the evidence, the aggravating as well as the mitigating circumstances, is found in Volume IV, R. 791-795 and is hereto attached and made a part hereof as Appendix A.
In the court's original order dated February 26, 1986, the following was stated with reference to mitigating circumstances: (R. 794-795)

"MITIGATING CIRCUMSTANCES ENUMERATED AND OTHERWISE PRESENTED
"The evidence does indicate that the Defendant has a significant history of prior criminal activity.
"The preponderance of the evidence establishes that the victims, Donald Bergquist and Hannelore Bergquist, were not participants in the Defendant's conduct, and the preponderance of the evidence further establishes that the victims did not consent to the Defendant's conduct.
"The evidence establishes that the Defendant was a major participant in the capital offense.
"The preponderance of the evidence establishes that he was not under extreme duress nor under the substantial domination of another person.
"The Court determines from a preponderance of the evidence presented that Joseph Bryant Hooks did have the capacity to appreciate the criminality of his conduct and finds no indication that his capacity was impaired.
"The evidence indicates that the Defendant was thirty-two years of age at the time of the capital offense.
"In addition to the above enumerated mitigating circumstances, the Defendant has been given the opportunity to present any other evidence of mitigating circumstances.
"The Court has also considered the jury recommendation of life imprisonment without parole in this case. This recommendation is expressly made advisory and non-binding by Section 13A-5-47(e) Code of Alabama. The advisory verdict is one of many facts to be considered against other facts and circumstances.
As directed by this court, the return filed in this court on June 10, 1987 contains the following order concerning "other mitigating circumstances from the evidence and considered in the case."

"IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA

"STATE OF ALABAMA

"VS.

"JOSEPH BRYANT HOOKS

CRIMINAL CASE NO. 85-588-TH

"ORDER ON REMAND
"In its opinion and order dated March 10, 1987, the Alabama Court of Criminal Appeals directed this Court to set out the other mitigating circumstances it found from the evidence, and considered in this case. In compliance with the remand, the Court extends its Sentencing Order dated February 26, 1986.
"In addition to the enumerated mitigating circumstances listed in the Court's February 26, 1986 order, the defendant had been given the opportunity to present any other evidence of mitigating circumstances. The defendant presented evidence of his psychiatric problems, of his drug abuse, of his expressions of remorse in committing the crime, and of his father's love and desire to see his son live. Those factors were found to be mitigating circumstances and were considered by the Court before sentencing. However, in light of all the evidence and after careful consideration, the Court *368 finds that these mitigating circumstances do not outweigh the aggravating circumstances.
"Done this the 29th day of May, 1987.
 /s/ H. Randall Thomas
 Circuit Judge"

XVIII
This court has reviewed the propriety of the death sentence in this cause as required by § 13A-5-53, Code of Alabama 1975. See also, Tarver v. State, 500 So.2d 1232 (Ala.Crim.App. 1986), aff'd, 500 So.2d 1256 (Ala.1987).
A review of the record reveals no error which has adversely affected the substantial rights of this appellant. A.R.A.P., Rule 45A.
In its written findings of facts (see Appendix A hereto attached) the trial court found the existence of the aggravating circumstance "that the offense was committed while the defendant was engaged in or was an accomplice in the commission of a robbery".
The trial judge has set forth, in the order hereto attached, his findings with reference to statutory mitigating circumstances as well as the non-statutory mitigating circumstances. See § 13A-5-51, Code of Alabama 1975.
We determine that the trial court's findings concerning the aggravating and mitigating circumstances are fully supported by the evidence in this cause.
The jury below recommended that the appellant be sentenced to life imprisonment without parole. As noted by the trial court, this recommendation is expressly made advisory and non-binding on the trial judge by § 13A-5-47(e), Code of Alabama 1975. See Ex parte Jones, 456 So.2d 380 (Ala.1984), Murry v. State, 455 So.2d 53 (Ala.Crim.App.1983), rev'd on other grounds, Ex parte Murry, 455 So.2d 72 (Ala.1984).
The trial court found that the aggravating circumstances outweighed the mitigating circumstances and, when used collectively, outweigh the mitigating circumstances. The trial court also considered the individual mitigating circumstances as required by law. Our independent review of the aggravating and mitigating circumstances in this case leads us to the conclusion that the trial judge's sentence of death was appropriate in this cause.
There is no evidence in this record that the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor.
Finally, considering both the nature of the crime and this appellant's involvement therein, we do not find that the death penalty was excessive or disproportionate with the penalty imposed in other similar cases. Particularly see Tarver v. State, 500 So.2d 1232 (Ala.Crim.App.1986), aff'd, Tarver v. State, 500 So.2d 1256 (Ala. 1987) and cases cited therein (p. 1251).
This appellant's conviction of this capital offense and his sentence of death are due to be and the same are, hereby, affirmed.
AFFIRMED.
All the Judges concur.

APPENDIX A

In the Circuit Court for Montgomery County, Alabama

STATE OF ALABAMA

VS.

JOSEPH BRYANT HOOKS

CRIMINAL CASE NO. CC-85-588-TH

ORDER
Joseph Bryant Hooks stands convicted by a jury of his peers of the capital offense of murder in violation of Alabama Code Sections 13A-5-40(a)(2) and 13A-5-40(a)(10).
In a separate sentencing phase, the same jury returned its advisory verdict that the Defendant be sentenced to life imprisonment without parole.
The Court, in accord with the statutory directives set forth in Section 13A-5-47, Code of Alabama, has ordered and received a written pre-sentence report which has been made part of the record of this *369 case. No part of this pre-sentence report has been, or shall be, kept confidential.
The State and Defendant have been given the right to present evidence to the Court about any part of the report. The Court has considered the pre-sentence report as to the background of the Defendant and as to other information in the report which is prescribed by law or court rule for felony cases generally. The Court, however, has made its own independent analysis of the existence or nonexistence of aggravating and mitigating circumstances. The Court has made its own special application of the facts which the Court has heard and carefully reviewed to the enumerated aggravating circumstances (Sections 13A-5-51 and 13A-5-52, Code of Alabama.
The parties have been given full and ample opportunity to present arguments concerning the existence of aggravating and mitigating circumstances.
The Court now, in accord with Alabama Code Section 13A-5-47(d), proceeds to enter written findings of fact summarizing the crime and the Defendant's participation in it. The Court also proceeds to enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, Code of Alabama, each mitigating circumstance enumerated in Section 13A-5-51, Code of Alabama, and as to any additional mitigating circumstances offered pursuant to Section 13A-5-52, Code of Alabama.

SUMMARY OF CRIME AND THE DEFENDANT'S PARTICIPATION IN IT
Joseph Bryant Hooks, the Defendant, was a carpenter by trade. The Defendant had entered into a contract with Donald and Hannelore Bergquist, the victims in this case, to perform certain carpentry work for them. The contract terms required Hooks to begin work on October 3, 1985, and to complete the job within twenty days. Hooks was to receive $2,500 for the contract work and $1,250 was paid in advance to him. After the twenty days for performance of the contract had elapsed, Hooks had not yet begun any work on the job. The Bergquists' concern over the situation prompted excuses from Hooks in reference to problems obtaining materials for the job.
On November 16, 1985, Hooks telephoned Donald Bergquist at approximately 9:00 a.m. and asked Mr. Bergquist if he would come to Hooks's home to approve some materials to be used in the contract work. Mr. Bergquist agreed to come and look at the materials. Donald Bergquist and his wife, Hannelore, then proceeded to go to the home of the Defendant.
In the meantime, Hooks went to the home of Linda Norris, a friend, and obtained a .38 pistol. Hooks had a key to the Norris home and took the pistol without the knowledge and consent of the owner. In a video-taped statement that the Defendant made after being taken into custody, the following question and answer occurred in reference to these events:
Q. Why did you go and get the gun?
A. It was the only thing that I thought would resolve the problem, the financial problem ... I didn't know any other way to get out of it though.
When Hooks returned to his house, Mr. and Mrs. Bergquist had already arrived there. Hooks showed the Bergquists some formica samples he planned to use. The Bergquists had objections to the color of the samples and wished to view alternatives. Hooks then suggested that the Bergquists look at some materials he had at his warehouse. The couple agreed to do this and then took the Defendant along with them in their automobile to a location following directions given to them by Hooks.
Hooks, in fact, had no warehouse. He had directed Mr. and Mrs. Bergquist to a location on the outskirts of the City of Montgomery, in Montgomery County, Alabama, down a dirt road where there was an abandoned house. Upon arriving at this obscure scene, Hooks drew the pistol and shot Donald Bergquist in the head and chest and then turned and shot Hannelore *370 Bergquist twice as she sat in the back seat. Hooks dragged the two bodies out of the car and left them out on the ground at the scene. The Defendant removed Donald Bergquist's wallet from his body and drove away in the victims automobile. After abandoning the vehicle in the parking lot of the Family Mart Discount Store, located at the intersection of Woodley Road and the Southern By-Pass in Montgomery, Hooks left by foot.
The body of Donald Bergquist was discovered by John Henry Roberts, a State Alcoholic Beverage Control Board agent who happened to be in the area on an investigation at approximately 12:40 p.m. on November 16, 1985. Roberts checked for a pulse and found none present. He then radioed the Montgomery police. Police investigators arrived shortly thereafter and discovered the body of Hannelore Bergquist still showing signs of life. Mrs. Bergquist would die six days later in the hospital as a result of the gunshot wounds.
When the bodies were discovered there was not an immediate identification of the victims as they had not been reported missing. A fingerprint identification confirmed the identity of Donald Bergquist. The ensuing police investigation revealed evidence of the contractual problems that existed between Hooks and the Bergquists which led to Hooks being named as a suspect. Hooks was called in to police headquarters at 11:00 p.m. on November 18 for questioning, at which time he told investigators that he was working in Prattville, Alabama, with an individual named Paul Seery on the morning of November 16, 1985. While Hooks was still at the police station, the police received a telephone call from Theresa Parsons, who informed them that Hooks worked with Tracey Parsons, her ex-husband, and Paul Seery, and that Hooks had asked them to be his alibi for the morning in question. Investigators went to the homes of Parsons and Seery and these two agreed to go to the police station. Seery told the police that Hooks had left the job at approximately 9:00 a.m. and did not return until about 1:00 p.m. Seery went on to say that Hooks came to see him on Saturday, November 17, and asked Seery to cover for his absence from work because Hooks feared that he would be a suspect in the murder of Donald Bergquist.
Hooks was advised of his Miranda Rights and was then informed of Seery's presence at the police station and the contents of Seery's statement. Joseph Bryant Hooks then confessed to the shooting of Donald and Hannelore Bergquist and of the circumstances which led to the crime.

SPECIFIC FINDINGS CONCERNING THE EXISTENCE OR NONEXISTENCE OF EACH AGGRAVATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-49; EACH MITIGATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-51; AND ANY ADDITIONAL MITIGATING CIRCUMSTANCES OFFERED PURSUANT TO SECTION 13A-5-52.

ENUMERATED AGGRAVATING CIRCUMSTANCES
The capital offense was not committed by a person under sentence of imprisonment.
The Defendant has not been previously convicted of another capital offense nor of a felony involving the use or threat of violence to the person.
This offense is not considered by the Court to involve the aggravating circumstance of "knowingly creating a great risk of death to many persons."
The offense was committed while the Defendant was engaged in or was an accomplice in the commission of a robbery.
The evidence does not indicate the crime was committed for the purpose of avoiding or preventing a lawful arrest of effecting an escape from custody.
Under the evidence presented, the Court does not find or consider that the capital offense was committed for pecuniary gain.
The Court does not consider under the evidence presented that the capital offense was committed to disrupt or hinder the *371 lawful exercise of any governmental function or the endorcement of laws.
The Court does not find from the evidence presented at trial that the capital offense was especially heinous, atrocious or cruel compared to other capital offense.

MITIGATING CIRCUMSTANCES ENUMERATED AND OTHERWISE PRESENTED
The evidence does indicate that the Defendant has a significant history of prior criminal activity.
The preponderance of the evidence establishes that the victims, Donald Bergquist and Hannelore Bergquist, were not participants in the Defendant's conduct, and the preponderance of the evidence further establishes that the victims did not consent to the Defendant's conduct.
The evidence establishes that the Defendant was a major participant in the capital offense.
The preponderance of the evidence establishes that he was not under extreme duress nor under the substantial domination of another person.
The Court determines from a preponderance of the evidence presented that Joseph Bryant Hooks did have the capacity to appreciate the criminality of his conduct and finds no indication that his capacity was impaired.
The evidence indicates that the Defendant was thirty-two years of age at the time of the capital offense.
In addition to the above enumerated mitigating circumstances, the Defendant has been given the opportunity to present any other evidence of mitigating circumstances.
The Court has also considered the jury recommendation of life imprisonment without parole in this case. This recommendation is expressly made advisory and non-binding by Section 13A-5-47(e) Code of Alabama. The advisory verdict is one of many facts to be considered against other facts and circumstances.

CONCLUSION
All of the proper evidence being received and arguments given, the Court has weighed each individual aggravating circumstance as it applies to Joseph Bryant Hooks and has weighed such aggravating circumstances collectively. The Court has weighed each mitigating circumstance individually and has weighed the mitigating circumstances collectively.
It is the conclusion of this Court that the aggravating circumstances overwhelmingly outweigh the mitigating circumstances. It is, therefore, this Court's opinion that the death penalty be imposed upon Joseph Bryant Hooks.
Done this 26th day of February, 1986.
 /s/ H. RANDALL
 THOMAS
 Circuit Judge
NOTES
[1] This could have been easily accomplished by turning off the sound portion of the video tape, as was done during the showing of another videotape later in the trial.
[2] The Supreme Court has denied certiorari in a case following Caldwell, supra, where the prosecutor stated "that the jury recommends the sentence, but the judge imposes it." State v. Busby, 464 So.2d 262, 265 (La.), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985).
[3] In Virginia, the jury's role is "more than advisory, resulting in more than just a recommendation of punishment." Once a jury returns a verdict fixing punishment at death, the trial judge must impose sentence in accordance with the jury's verdict or set aside the jury's verdict "only after a consideration of a probation officer's report and `upon good cause shown.'" "The jury's verdict is not merely a recommendation to be followed or rejected by the trial court at its discretion." Frye, supra at 286.
[4] Under Illinois law, the trial judge must sentence the defendant to death if the jury finds that "there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence on the defendant." Perez, supra 90 Ill.Dec. at 942, 483 N.E.2d at 260.
[5] The Court also addressed the trial judge's use of the word "recommend" during voir dire. It was held that since defense counsel failed to object to the use of the word during voir dire, he waived the issue on appeal. Further, the use of the word "recommend" by the trial judge did not constitute plain error.
[6] KRS 532.025(1)(b) states in pertinent part:

"Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.'"
[7] "In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to section 13A-5-46(a) or 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
[8] There is no constitutional requirement that sentencing determinations be made by a jury. Jeffers v. Ricketts, 627 F.Supp. 1334, 1361 (D.Ariz.1986).